# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
EGENIX, INC.,                                                :   Case No. 14-12818 (BLS)
                                                             :
         Debtor.¹                                            :
                                                             :
------------------------------------------------------------ x
```

**DECLARATION OF WILLIAM T. NOLAN IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, William T. Nolan, declare and state as follows:

1. I am the Chief Restructuring Officer of Egenix, Inc. ("Egenix" or the "Debtor"), a corporation organized under the laws of the state of Delaware and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case").

2. To minimize any disruption to the Debtor's business and ensure a smooth transition into chapter 11, the Debtor intends to request limited types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the Chapter 11 Case.[2] I submit this declaration in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings. I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

---

[1] The last four digits of the Debtor's federal tax identification number are 0172. The mailing address for the Debtor is 2363 Clove Road, LaGrangeville, NY 12540.

[2] Except as otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the relevant First Day Pleading.

53653/0001-11359498v2

3. I have served as a financial and restructuring advisor to Egenix since June 2014 and, upon the commencement of the Chapter 11 Case, was appointed Chief Restructuring Officer of Egenix. I am a seasoned financial advisor and investment banker with over thirty-five years of experience in corporate finance, capital markets and restructurings. In 1989, I founded Devonshire Holdings, Inc. to assist small and medium-sized companies with financial advisory services, including restructurings, turnarounds, buyouts and private placements, and I continue to serve as president of Devonshire. As a result of my time with the Debtor, my review of relevant documents and my discussions with other members of the Debtor's management team and board of directors (the "Board"), I am generally familiar with the Debtor's day-to-day operations, business affairs and books and records.

4. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's management and Board, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtor's operations and financial condition. In making this Declaration, I also have relied on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5. This Declaration is divided into two parts. Part I provides background information about the Debtor, its business, capital structure, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I

## BACKGROUND

**A.     The Chapter 11 Filings**

6.      On December 28, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**B.     The Debtor's Business**

7.      Egenix is a privately held biotechnology company focused on the development of innovative cancer therapeutics.

8.      The foundation of Egenix's cancer therapeutics program is based on the development of small molecule drugs that block mRNA translation, thus blocking the production of specific proteins that are critical for cancer growth and survival. These small molecule drugs mediate this activity through inhibition of "translation initiation factors." Translation initiation factors are essential elements for synthesis of multiple cancer promoting proteins, including those that stimulate cancer growth, metastasis, angiogenesis (tumor blood vessel growth), and suppression of apoptosis (programmed cell death).

9.      Cancer growth and metastasis requires an interplay of numerous and diverse gene products (proteins). The translation initiation factors eIF4E and eIF2$\alpha$ (the "Translation Initiation Factors") selectively promote the synthesis of these proteins and drive malignant growth and metastatic progression. Overexpression of the Translation Initiation Factors occurs frequently in multiple human cancers including leukemia, lymphoma, melanoma, and cancers of the colon, lung and breast.

10. The Translation Initiation Factors represent critical convergence points for regulation of key growth and metastasis genes. Blocking the activity of the Translation Initiation Factors dramatically suppresses malignant transformation, tumor growth and metastasis. The Translation Initiation Factors are compelling cancer therapeutic targets because multiple processes required for cancer growth and metastasis are mediated by proteins that are regulated by these translation initiation factors.

11. Egenix's program to discover and develop inhibitors for cancer therapeutics represents an innovative approach for treating a broad spectrum of cancers.

C. **The Debtor's Corporate Structure**

12. Egenix is a privately held Delaware corporation.[3] The ownership interests of Egenix include common stock (the "Common Stock"), preferred stock and Series A Preferred Stock. The Debtor's former Chairman of the Board and Chief Executive Officer, Donald C. Fresne ("Fresne"), Denan, Inc. and Lionel Goldfrank III are the majority equity holders of the Debtor.

D. **The Debtor's Prepetition Debt Structure**

13. As set forth in more detail below, as of the Petition Date, the Debtor had aggregate outstanding unsecured debt of approximately $3.6 million arising in connection with (i) a promissory note issued in connection with business operations ($2 million), and (ii) accounts payable, accrued liabilities and other liabilities (approximately $1.6 million).

14. <u>The Promissory Note</u>. Egenix executed a Promissory Note (the "Note"), dated as of June 4, 2014, with Denan, Inc. ("Denan"), pursuant to which Denan agreed to make a loan (the "Loan") to Egenix for business purposes in the amount of $2 million, with interest on

---

[3] Egenix was originally incorporated in Delaware on April 24, 1991 under the name of Epigen, Inc.

the outstanding principal amount accruing at the rate of twelve percent (12%) from the date of the Note until the date of repayment.  The entire balance of the Note, including any accrued but unpaid interest, is due and payable on March 4, 2015.

15. To induce Denan to extend the Loan, the Debtor issued to Denan shares of its Common Stock, $.01 par value per share, representing ten percent (10%) of the issued and outstanding shares of the Debtor's Common Stock on a fully diluted basis as of the issue date. Pursuant to the anti-dilution protections of the Note, if Debtor issues additional shares of Common Stock, or securities exercisable for or convertible into shares of the Debtor's Common Stock, then the Debtor shall issue to Denan such number of additional shares of the Debtor's Common Stock such that the number of shares of the stock held by Denan will be equal to 10% of the Debtor's issued and outstanding Common Stock, on a fully diluted basis, as of the date of issuance of the additional stock.

16. Also as an inducement for Denan to enter into the Loan represented by the Note, Fresne absolutely, unconditionally and irrevocably guaranteed to Denan that it would receive from Fresne any and all amounts to which Denan is entitled under the terms of the Note, upon the Debtor's failure to pay all amounts due on the maturity date of the Note or upon an Event of Default (as defined in the Note).  The Note also provided for two additional Board seats to be occupied by Denan's principals.

17. As of the Petition Date, the Debtor estimates that the amount outstanding on the Note is $2 million, plus accrued interest.

18. <u>Other Unsecured Debt</u>.  The Debtor has incurred approximately $1.6 million in other unsecured debt in the ordinary course of business in the form of accounts payable, accrued liabilities and other liabilities as of the Petition Date.

**D.     Factors Leading To Chapter 11 Filing**

19.     Although the Debtor and its corporate and scientific advisors believe that the Debtor's cancer therapeutics technology is promising, the Debtor requires additional funding from investors to continue the Debtor's research and development efforts and meet its current and future financial obligations. Indeed, as noted above, the entire $2 million balance of the Note comes due in March 2015—and the Debtor will have no ability to repay this debt at that time, absent new investment in the Debtor.

20.     To address its funding needs, in June 2014, the Debtor retained Devonshire to identify sources of further funding and raise capital. Through its normal due diligence process, Devonshire identified a number of issues that it felt would limit its ability to attract additional investment in the Debtor. Most significantly, Devonshire identified a series of agreements with investors and employees that granted shares of the Debtor's Common Stock—and then guaranteed that such equity grants would not be diluted. These agreements—which apply to 33% of the Debtor's Common Stock—would immediately and drastically dilute the investment of any equity investor, and therefore pose a significant barrier to entry for any new investor.

21.     Making matters worse, the Company also entered into a series of agreements with consultants and researchers that grant Common Stock to such individuals and firms upon the attainment of certain future milestones in the product development cycle (most commonly, success in a Phase 1 Clinical Trial). These agreements, which purport to grant over 20% of the Company's Common Stock, were structured to provide a certain percentage of the Debtor's Common Stock outstanding on the date the Debtor achieves the applicable milestone—

6

rather than a fixed number of shares—and will lead to significant future dilution of current shareholders and future investors.

22. Devonshire also determined through its diligence review that (i) the Debtor had not been consistently paying its debts as they matured; (ii) the Debtor's books and records, including its financial statements, were incomplete and inaccurate; (iii) there were few if any accounting controls in place; and (iv) there had been no corporate audit since 2010. While these issues are correctable—and indeed are being corrected—they limit the Debtor's ability in the short term to raise additional capital.

23. Given these roadblocks to raising new capital, the Debtor's dwindling supply of cash to fund operations and ongoing research and development, and the impending maturity of the Note, the Debtor's Board made the difficult decision to file for chapter 11 protection in order to preserve the Debtor's enterprise value for the benefit of all stakeholders.

**E.     Objectives of Chapter 11 Filing**

24. The Debtor has filed for chapter 11 protection to restructure its balance sheet, which will facilitate the raising of additional capital investment in the Debtor to fund its operations and ongoing and future research and development. As the Debtor's Chief Restructuring Officer, I will shepherd the Debtor through the chapter 11 process and ensure that, going forward, the Debtor's business will be conducted with proper accounting and governance controls and processes. Through this balance sheet restructuring, I believe that the value of the Debtor's enterprise will be maximized, thereby providing benefit to all of the Debtors' stakeholders.

## PART II

## FIRST DAY PLEADINGS

25. In furtherance of these objectives, the Debtor has filed the First Day Pleadings, and respectfully requests that the Court consider entering the proposed orders granting the relief sought in such First Day Pleadings. I have reviewed each of the First Day Pleadings and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Case.

**A.     Application for Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Del. Bankr. L. R. 2002-1(f),** *Nunc Pro Tunc* **to the Petition Date ("Claims and Noticing Agent Application")**

26. By the Claims and Noticing Agent Application, the Debtor requests entry of an order appointing Donlin, Recano & Company, Inc. ("DRC") as claims and noticing agent in the Chapter 11 Case. I understand that such appointment is required by the rules of this Court. Moreover, I believe that such relief is prudent in light of the fact there will be in excess of 1,000 entities to be noticed. In view of the number of anticipated claimants and other notice parties, the Debtor submits that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtor's estates and creditors.

27. As more fully detailed in the Claims and Noticing Agent Application, I understand that DRC will engage in certain Claims and Noticing Services, including, but not limited to, maintenance, processing and docketing proofs of claim filed in the Chapter 11 Case. DRC will also work with the Office of the Clerk of the United States Bankruptcy Court for the

District of Delaware (the "Clerk") to ensure that its methodology conforms to all of the Court's procedures, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") and the provisions of any orders entered by this Court.  Moreover, I am informed that the Claims and Noticing Agent Application pertains only to the work to be performed by DRC under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Rule 2002-1(f).

28. I am advised that DRC has acted as the claims and noticing agent in numerous chapter 11 cases, including several cases that were commenced in the United States Bankruptcy Court for this District, and that DRC, therefore, is well qualified to provide the Debtor with experienced noticing and claims services in connection with this Chapter 11 Case. Given the need for the services described above and DRC's expertise in providing such services, I believe that retaining DRC will expedite service of notices, streamline the claims administration processes, and permit the Debtor to focus on its chapter 11 efforts.

29. Accordingly, on behalf of the Debtor, I respectfully submit that the Claims and Noticing Agent Application should be approved.

A. **Motion for Order (I) Authorizing Continued Use of Existing Bank Account and Business Forms and (II) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Bank Account Motion").**

30. By the Bank Account Motion, the Debtor seeks entry of an order (i) authorizing the Debtor to continue using its existing bank account and business forms, and (ii) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtor's deposit and investment practices. The Debtor maintains a bank account (the "Bank Account") at Bank of Millbrook.  Information regarding the Bank Account is set forth in Exhibit A to the Bank Account Motion.  There is approximately $600,000 in the Bank Account.

9

In connection with the Bank Account, the Debtor utilizes preprinted checks, stationery and other forms (the "Business Forms").

31. The Debtor only has one bank account, and it will not be difficult for the Debtor to monitor the account's activity. It is my understanding that, as of the Petition Date, the Debtor had one prepetition check outstanding, and therefore there is no risk that prepetition claims will be inadvertently paid postpetition through the honoring of checks issued prior to the Petition Date. The Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by it prior to the Petition Date without Court authorization, including advising Bank of Millbrook of the Debtor's Chapter 11 Case.

32. Further, the Debtor believes that ceasing to use its existing forms and checks and purchasing new forms and checks would cause an unnecessary expense and burden on the Debtor. The Debtor can take appropriate care to ensure the proper use of its existing Business Forms and checks until the Debtor's supply of forms and checks is depleted. Accordingly, the Debtor seeks authority to continue using its existing Bank Account and Business Forms.

33. It is my understanding that Bank of Millbrook is a financial institution insured by the Federal Deposit Insurance Corporation and that the Debtor's Bank Account is federally insured. It is my further understanding, however, that the balance in the Bank Account exceeds the federally insured limit. Although the Bank Account balance exceeds the federally insured limit, I believe that the Bank of Millbrook is a stable financial institution, and therefore do not believe that the funds in such account are at risk. The Debtor thus believes that cause exists to grant an interim forty-five (45) day waiver of the requirement of section 345(b) of the Bankruptcy Code, and therefore, seeks such a waiver.

34. Accordingly, on behalf of the Debtor, I respectfully submit that Cash Management Motion should be approved.

## CONCLUSION

The Debtor's ultimate goal in this Chapter 11 Case is to create a sustainable capital structure for the future that maximizes the value of the Debtor's estate for the benefit of all the Debtor's constituents. In the immediate term, however, in order to minimize any loss of value of its business during the Chapter 11 Case, the Debtor's most pressing objective is to minimize the disruption to the Debtor's operation to the greatest extent possible as it enters chapter 11. The Debtor believes that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving this objective and, in turn, its overriding goal in this Chapter 11 Case, will be substantially increased.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 30, 2014
      LaGrangeville, New York

*William T. Nolan* (signature)

William T. Nolan
Chief Restructuring Officer