## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
            :

In re:                :     Chapter 11
            :

EGENIX, INC.,        :     Case No. 14-12818 (BLS)
            :

       Debtor.[1]   :     **Hrg. Date: 3/4/15 at 11:00 a.m. (ET)**
            :     **Obj. Deadline: 2/25/15 at 4:00 p.m. (ET)**
            :
-------------------------------------------------------- x

## DEBTOR'S MOTION FOR ENTRY OF ORDER
## (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
## SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362
## AND 364(c) AND (II) GRANTING LIENS AND SUPERPRIORITY
## CLAIMS TO DIP LENDERS PURSUANT TO 11 U.S.C. § 364

Egenix, Inc., the debtor and debtor-in-possession in the above-captioned chapter

11 case (the "Debtor"), hereby moves (the "Motion"), pursuant to sections 105(a), 362 and 364 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002,

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), for entry of an order (the "DIP Order"),

substantially in the form attached hereto:[2]

    (a)     authorizing the Debtor to obtain postpetition financing (the "DIP
           Financing"), consisting of a first-lien superpriority term loan
           facility (the "DIP Facility") in the aggregate principal amount of
           $1,300,000, funded by loans (each, a "DIP Loan" and, collectively,
           the "DIP Loans"), from each of the following persons or entities
           (each, a "DIP Lender" and, collectively, the "DIP Lenders") in the
           amounts set forth below (each, a "Funding Amount" and,
           collectively, the "Funding Amounts"):

---

[1]    The last four digits of the Debtor's federal tax identification number are 0172.  The mailing address for the Debtor is 2363 Clove Road, LaGrangeville, NY 12540.

[2]    All capitalized terms used but not otherwise defined in the Motion shall have the meanings set forth in the Term Sheet (as defined herein).

| DIP Lender | Funding Amounts |
|---|---|
| Lionel Goldfrank, III | $600,000 |
| John T. Reid, Ph.D. | $250,000 |
| David Clapp | $150,000 |
| Denan, Inc. | $100,000 |
| W. James Tozer, Jr. | $100,000 |
| Paul Schwartz | $100,000 |
| Total | $1,300,000 |

(b)  authorizing the Debtor to execute and deliver, and incur all liabilities and obligations under:

(i)  that certain Debtor-In-Possession Financing Term Sheet, dated as of February 11, 2015, as amended, modified, restated or supplemented in accordance with the terms thereof or hereof (the "Term Sheet"), a copy of which is attached to the DIP Order as Exhibit 3, and perform all such other and further acts as may be required in connection with the respective DIP Documents;[3] and

(ii)  all other agreements, documents, notes, or instruments as may be required, necessary or desirable (including all collateral documents) and which are executed or delivered in connection with the Term Sheet, including the budget attached to the DIP Order as Exhibit 1 (the "Budget") and the Professional Fee Budget attached to the DIP Order as Exhibit 2 (the "Professional Fee Budget");

(c)  authorizing the Debtor to use proceeds of the DIP Facility solely as expressly permitted in the DIP Documents, including the use solely to fund the Debtor's operations;

(d)  granting automatically perfected security interests in and liens on all of the DIP Collateral (as defined below) to the DIP Lenders, and granting superpriority administrative expense status to the DIP Obligations (as defined in the Term Sheet), in each case on the terms and subject to the relative priorities set forth in the DIP Documents;

(e)  authorizing the Debtor to pay the principal, interest, fees, expenses, disbursements and other amounts payable under the DIP Documents as such amounts become due and payable; and

---

[3]  "DIP Documents" shall mean, collectively, any collateral documents, guaranties, the Budget, the Professional Fee Budget and all such instruments and documents as may be executed and delivered in connection with or relating to the DIP Facility, the DIP Order and any certificate or other document made or delivered pursuant hereto or thereto.

2

(f)     vacating and modifying the automatic stay imposed by section 362
of the Bankruptcy Code to the extent necessary to implement and
effectuate the terms and provisions of the DIP Order and the other
DIP Documents.

In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157
and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the case and
the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections
105(a), 362 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local
Rule 4001-2.

## BACKGROUND

### A.     The Chapter 11 Case

3.      On December 28, 2014 (the "Petition Date"), the Debtor commenced a
case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the
"Chapter 11 Case").  The factual background regarding the Debtor, including its business
operations, its capital and debt structure, and the events leading to the filing of the Chapter 11
Case, is set forth in the Declaration of William T. Nolan in Support of Chapter 11 Petition and
First Day Pleadings [Docket No. 9] (the "First Day Declaration").

4.      The Debtor continues to manage and operate its business as a debtor-in-
possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      On January 22, 2015, the United States Trustee for the District of
Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in the

53653/0001-11447386v8

Chapter 11 Case pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 46]. No

trustee or examiner has been appointed in the Chapter 11 Case.

**B.      The Debtor's Corporate Structure**

6.      Egenix is a privately held Delaware corporation.[4] The ownership interests

of Egenix include common stock (the "Common Stock") and Series A Preferred Stock. The

Debtor's former Chairman of the Board and Chief Executive Officer, Donald C. Fresne, Denan,

Inc. and Lionel Goldfrank, III are the majority equity holders of the Debtor.

**C.      The Debtor's Prepetition Debt Structure**

7.      As of the Petition Date, the Debtor had aggregate outstanding unsecured

debt of approximately $3.6 million arising in connection with (i) a promissory note issued in

connection with business operations (approximately $2 million); and (ii) accounts payable,

accrued liabilities and other liabilities (approximately $1.6 million). The Debtor currently has no

secured debt.

## NEED FOR DIP LOANS

8.      The Debtor has no revenues, and therefore must rely on the funds in its

bank account and borrowings to fund its operations (primarily research and development efforts)

and the administration of the Chapter 11 Case. Without access to additional funding through the

DIP Loans, the Debtor is projected to run out of cash in late February or early March.

Accordingly, it is imperative that the DIP Facility be approved.

9.      Although the Debtor sought financing that would fund the Chapter 11

Case through the end of June 2015, the Debtor was able to obtain only limited financing at this

time. Based on its current projections, the DIP Loans to be made to the Debtor under the DIP

---

[4]      Egenix originally was incorporated in Delaware on April 24, 1991, under the name of Epigen, Inc.

4

Facility should support the Debtor's operations through at least mid-April 2015. The Debtor

believes, however, that after the receipt of important test results in April, it will be possible to

procure the additional financing necessary to facilitate the Debtor's exit from chapter 11.

10.     The Debtor's Chief Restructuring Officer (the "CRO") negotiated the

Term Sheet in good faith and at arms'-length with the DIP Lenders. The Debtor believes that the

terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent

business judgment consistent with its fiduciary duties and are supported by reasonably equivalent

value and fair consideration. Accordingly, the Debtor submits that the DIP Facility should be

approved.

### SUMMARY OF DIP FINANCING TERMS

11.     In accordance with Bankruptcy Rules 4001(c) and (d), summarized below

are the significant terms of the DIP Documents and DIP Order. Included in this summary is a

description of each of the provisions required to be highlighted by Bankruptcy Rule 4001(c) and

Local Rule 4001-2.[5]

| | |
|---|---|
| Borrower: | Egenix, Inc. |
| DIP Lenders: | Lionel Goldfrank, III, John T. Reid, Ph.D., David Clapp, Denan, Inc., W. James Tozer, Jr. and Paul Schwartz. |
| Commitment and Availability: | The DIP Financing will be in the aggregate principal amount of $1,300,000 plus all capitalized interest thereon pursuant to the terms of the Term Sheet (such amount, the "Principal Amount") and will be made available to the Debtor in accordance with the Budget until the Maturity Date (as defined below). Upon entry of the DIP Order, the Debtor shall borrow the full amount of the DIP Financing. |

---

[5]     The descriptions of the terms of the proposed DIP Order provided in the Motion are intended only as a summary. In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Order, the terms of the DIP Order shall govern. Local Rule 4001-2 requires the Debtor to highlight certain provisions in the Motion. Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-2 are shown in bold and references to the Term Sheet and DIP Order are provided.

5

| | |
|---|---|
| Allocation of DIP Loans: | Each DIP Lender shall be deemed to have funded a proportion of the DIP Loans equal to the amount of the DIP Loans multiplied by a fraction, the numerator of which shall equal the DIP Lender's Funding Amount, and the denominator of which shall equal the sum of the Funding Amounts of all DIP Lenders. |
| Funding by DIP Lenders: | Within three (3) business days after entry of the DIP Order, the DIP Lenders shall send by wire transfer the full amount of their respective Funding Amounts to a bank account designated by the Debtor. |
| Majority Consent Required: | Any condition under the Term Sheet that requires the DIP Lenders to provide approval, agreement or consent, including an agreement to waive or relinquish a right, shall be deemed satisfied when DIP Lenders holding the majority in dollar amount of the DIP Loans provide such approval, agreement or consent, or agree to waive or relinquish a right.  Moreover, when the Term Sheet permits the DIP Lenders to take any action, such action shall be permitted to be taken only if DIP Lenders holding the majority in dollar amount of the DIP Loans elect to take such action. |
| Interest Rate: | 6.0% per annum (the "Base Rate"). |
| Default Interest Rate: | Base Rate of 6.0%, plus 2.0% (the "Default Interest Rate"). |
| Maturity Date: | Unless accelerated by an Event of Default (as defined below), the DIP Financing shall be paid in full in cash on the date (the "Maturity Date") which is the earliest of (i) 365 days from the Petition Date; (ii) the effective date of a plan of reorganization or liquidation; (iii) the consummation of a sale(s) of all or substantially all of the assets of the Debtor; (iv) the occurrence of a Termination Event; (v) the entry of an order by the Court approving an alternative debtor-in-possession financing facility; and (vi) such later date as the DIP Lenders in their sole discretion may agree to in writing with the Debtor. |
| Purpose: | All advances under the DIP Financing shall be used by the Debtor solely to fund its operations, in accordance with the Budget approved by the DIP Lenders, as such Budget may be modified with the DIP Lenders' written consent and without further order of the Court.  Compliance with the Budget will be measured every two (2) weeks on a trailing four (4) week basis.  For the avoidance of doubt, (i) the Debtor may amend the Budget with the written consent of the DIP Lenders; provided that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP |

Financing authorized by the DIP Order; and (ii) at any given time, the Debtor's actual cash disbursements may, on a cumulative basis, vary from the Budget by no more than 10.0% (the "Permitted Variance").

**Liens, Security and Priority:**

**A grant of priority or a lien on property of the estate under section 364(c). Bankruptcy Rule 4001(c)(1)(B)(i). See Term Sheet, pp. 5-6; DIP Order, ¶¶ 13-15, 20.**

**The DIP Obligations pursuant to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code shall (i) constitute allowed superpriority administrative expense claims; (ii) be secured by first priority, perfected liens on and security interests in all the DIP Collateral (as defined below), including all property of the Debtor's estate in the Chapter 11 Case, whether now owned or hereafter acquired and all proceeds thereof; and (iii) be subordinate the Carve-Out.**

**The property of the Debtor that is subject to the aforesaid perfected liens and/or security interests in favor of the DIP Lenders shall include, but not be limited to, all assets and property of the Debtor and its estate, whether now owned or existing or hereafter acquired, created or arising and wherever located (collectively, the "DIP Collateral").**

**Borrowing Conditions:**

Availability of the DIP Financing shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Lenders and must be satisfied on occasion of each drawdown under the DIP Financing, unless waived in writing in advance by the DIP Lenders:

1.    The Court shall have entered a final and nonappealable order, in form and substance acceptable to the DIP Lenders on or before March 6, 2015, which order, inter alia, shall approve the DIP Financing on a final basis, including, without limitation, the grant of, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable and fully perfected DIP Liens upon all DIP Collateral with the priority as set forth in the section entitled "Priority and Liens" in the Term Sheet, to secure the DIP Obligations of the Debtor under the DIP Financing in accordance with the terms of the Term Sheet, effective as of the granting of the DIP Order, without the need for any further action on the part of the DIP Lenders, the Debtor or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing,

7

indexing, entering or registering of any financing statements or other similar instruments or documents).

2.   The DIP Lenders shall have been granted, and hold, a perfected first priority lien on, and security interest in, all property of the Debtor and proceeds thereof.

3.   The DIP Lenders shall have received and approved the Budget and the Debtor shall be in compliance with the Budget subject to Permitted Variances.

4.   All representations and warranties of the Debtor set forth in the Term Sheet shall be accurate in all material respects, on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date.

5.   The DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lenders, and no application or motion shall have been made to the Court for any stay, modification or amendment of the DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

6.   No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

Events of Default:   The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, referred to as an "Event of Default") shall constitute a default under the Term Sheet:

1.   The failure by the Debtor to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the Term Sheet or the DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within three (3) business days from notice of default.

2.   The cessation of the DIP Financing to be in full force and effect or the DIP Financing being declared by the Court to be null and void or the validity or enforceability the DIP Financing being contested by the Debtor or the Debtor denying in writing that it has any further liability or

8

obligation under the DIP Financing or the DIP Lenders ceasing to have the benefit of the DIP Liens.

3.   Except as permitted in the DIP Order, the entry of any order of the Court granting to any third party a superpriority claim or lien pari passu with or senior to that granted to the DIP Lenders under the Term Sheet.

4.   The Debtor shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Financing or other than in accordance with the Budget approved by the DIP Lenders.

5.   If, as of any Reporting Date (as defined in the Term Sheet), the Debtor's cumulative cash disbursements from the period from the Petition Date through the end of any calendar month exceeds 20% from the amount included in the Budget (i.e., exceeds scheduled disbursements by more than 20%).

6.   The entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor filing a motion or not opposing a motion seeking such relief.

7.   The entry of an order dismissing the Chapter 11 Case, or the Debtor filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Lenders.

8.   The entry of any order in the Chapter 11 Case or any successor case, which order constitutes the stay, modification, appeal or reversal of the DIP Order or which otherwise affects the effectiveness of the DIP Order.

9.   The entry of an order in the Chapter 11 Case appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtor's business.

10.  The expansion of the Board beyond its current size of six (6) members, or the removal of Dendy Young, Andrea Young, Lionel Goldfrank, III or John T. Reid, from the Board.

11.  The entry of an order in the Chapter 11 Case granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the DIP Collateral, of the Debtor or to commence or continue any prepetition litigation against the Debtor involving potential

9

liability not covered by insurance, in excess of $200,000 in the aggregate.

12. Any judgment or order as to postpetition liability or debt for the payment of money in excess of $200,000 shall be rendered against the Debtor and the enforcement thereof shall not have been stayed.

13. Any non-monetary judgment or order with respect to a postpetition event shall be rendered against the Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtor; or (ii) have a material adverse effect on the rights and remedies of the DIP Lenders hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

14. The DIP Order being amended or modified without the consent of the DIP Lenders.

Remedies:    If any Event of Default occurs and is continuing, the DIP Lenders may take any or all of the following actions:

1. Declare the commitment of the DIP Lenders to make loans under the DIP Financing to be terminated, whereupon such commitment shall be terminated.

2. Declare the unpaid Principal Amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Financing, the Term Sheet or the DIP Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtor under the Term Sheet.

3. Declare interest on the DIP Obligations to accrue at the Default Interest Rate, whereupon the interest on the DIP Obligations shall automatically accrue at such default rate.

4. Subject to the Default Notice Period (as defined in the Term Sheet), (i) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral; (ii) collect,

10

foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral; (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose; (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations (including any accrued interest) in any sale of the DIP Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 726 of the Bankruptcy Code, or otherwise; and (v) take whatever other action the DIP Lenders may deem necessary or desirable for the protection of their interests.

5.    Exercise all rights and remedies available to the DIP Lenders (whether as secured creditors or otherwise) under the DIP Financing, the Term Sheet, the DIP Order or applicable law (including in respect of the DIP Collateral).

Waiver / Modification:

**Waiver or modification of provisions of the Bankruptcy Code or applicable rules relating to the automatic stay or an entity's request to obtain credit under section 364 of the Bankruptcy Code. Bankruptcy Rules 4001(c)(1)(B)(iv) and 4001(c)(1)(B)(v). <u>See</u> Term Sheet, pp. 13-14; DIP Order, ¶¶ 23, 25.**

At all times during the Chapter 11 Case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have to (i) challenge the application of any payments authorized by the DIP Order pursuant to section 506(b) of the Bankruptcy Code; (ii) seek authority to grant liens on the DIP Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, or pari passu with, the DIP Liens, the DIP Superpriority Claims or any other liens or claims granted to the DIP Lenders, unless the DIP Obligations are first repaid in full in cash and the DIP Facility is terminated or the DIP Lenders have provided their prior written consent to such action; or (iii) seek authority to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Lenders, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtor uses the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations or the DIP Lenders have provided their prior written consent to such action.

53653/0001-11447386v8

Subject to the DIP Order, upon the occurrence of a Termination Event (as defined in the DIP Order), the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies provided in the DIP Order and the other DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to the Court: (i) immediately cease making any DIP Loans to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately terminate the DIP Facility and the availability of any DIP Loans thereunder; (iv) immediately set off any and all amounts held on account of or owed to the Debtor against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lenders for application towards the DIP Obligations; and (v) take any other actions or exercise any other rights or remedies permitted under the DIP Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; _provided that_ notwithstanding anything in the Term Sheet to the contrary, the DIP Lenders shall not enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period.

Carve Out:                **Disparate treatment for the professionals retained by the Committee from those professionals retained by the Debtor with respect to a professional fee carve out. Local Rule 4001-2(a)(i)(F). Se̲e̲ Term Sheet, pp. 6-7; DIP Order, ¶ 17.**

**As more fully set forth in the DIP Order, the DIP Liens and the DIP Superpriority Claims shall be subordinate to the "C̲a̲r̲v̲e̲ O̲u̲t̲." The "C̲a̲r̲v̲e̲ O̲u̲t̲" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000; (iii) after the occurrence and during the continuance of an Event of Default, all allowed and unpaid professional fees and disbursements incurred by the Debtor and any statutory committees appointed in the Chapter 11 Case (each, a "C̲o̲m̲m̲i̲t̲t̲e̲e̲" and, collectively, the "C̲o̲m̲m̲i̲t̲t̲e̲e̲s̲"), that remain unpaid subsequent to the payment, p̲r̲o̲ r̲a̲t̲a̲ with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtor's estate for such creditors, in an aggregate amount not exceeding $100,000 for the payment of the Debtor's professionals and $30,000 for payment of the Committees' professionals, which amount may be used**

12

subject to the terms of the Term Sheet and the DIP Order (the "Permitted Professional Fees"); and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and any Committees at any time when no Event of Default is continuing, that remain unpaid or unfunded subsequent to an Event of Default, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent Professional Fee Budget delivered to and approved by the DIP Lenders prior to any Event of Default that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing in the Term Sheet shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.

|                              |                                                                 |
| ---------------------------- | --------------------------------------------------------------- |
| Release from Lending Obligations: | Release and limitation on claims and causes of action. Bankruptcy Rule 4001(c)(1)(B)(viii).  See Term Sheet, p. 14; DIP Order, ¶ 22. |

Upon the repayment of all DIP Obligations owed to the DIP Lenders by the Debtor and termination of the rights and obligations arising under the DIP Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lenders), the DIP Lenders in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Term Sheet, the DIP Documents or the DIP Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out), on terms and conditions acceptable to the DIP Lenders. Notwithstanding anything to the contrary in the Term Sheet, the Debtor's releases do not extend to the DIP Lenders' obligations to make the advances and otherwise comply with the terms of the Term Sheet and the DIP Order.

|                   |                                                                 |
| ----------------- | --------------------------------------------------------------- |
| Indemnification:  | The indemnification of any entity.  Bankruptcy Rule 4001(c)(1)(B)(ix).  See Term Sheet, pp. 14-15; DIP Order, ¶ 21. |

The DIP Lenders (and their respective affiliates and their respective officers, directors, employees, advisors and agents)

13

**will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the Term Sheet or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person.**

Governing Law          Delaware
and Jurisdiction:

## RELIEF REQUESTED

12.     The Debtor seeks entry of the DIP Order granting the following relief:

a.      authorizing the Debtor to execute and deliver the Term Sheet and obtain up to $1,300,000 of secured postpetition loans, advances and other financial accommodations pursuant to the DIP Order;

b.      granting an allowed DIP Superpriority Claim to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

c.      granting to the DIP Lenders security interests in, and liens on, all of the DIP Collateral pursuant to section 364(c)(2) of the Bankruptcy Code; and

d.      modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Order.

## BASIS FOR RELIEF

13.     As set forth herein, the Debtor requires immediate access to the DIP Facility.  Indeed, without access to additional funding through the DIP Loans, the Debtor is projected to run out of cash in late February or early March.  The DIP Facility was negotiated among the parties in good faith and at arms'-length, and the Debtor believes that the terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.  Thus, the Debtor submits that the DIP Financing is in the best interests of

14

the Debtor's estate, creditors and all other stakeholders and, therefore, the relief requested herein

should be granted.

**A.     The Debtor Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

14.     Section 364(c) of the Bankruptcy Code requires a finding, made after

notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot

"obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an

administrative expense."  11 U.S.C. § 364(c).

15.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, the Debtor has the burden of proving that:

> (1)     It is unable to obtain unsecured credit pursuant to
> 11 U.S.C. § 364(b), <u>i.e.</u>, by allowing a lender only
> an administrative claim pursuant to 11 U.S.C.
> § 503(b)(1)(A);
>
> (2)     The credit transaction is necessary to preserve the
> assets of the estate; and
>
> (3)     The terms of the transaction are fair, reasonable and
> adequate, given the circumstances of the debtor-
> borrower and the proposed lender.

<u>In re Los Angeles Dodgers, LLC</u>, 457 B.R. 308, 312 (Bankr. D. Del. 2011).

16.     The Court "may not approve any credit transaction under subsection

(c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain

unsecured credit under section 364(a) or (b)."  <u>Id.</u> at 313 (citing <u>In re Ames Dep't Stores, Inc.,</u>

115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)).  To satisfy the requirements of section 364(c) of the

Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not

available" to the debtor on an unsecured or administrative expense basis.  <u>Bray v. Shenandoah</u>

<u>Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986).  The

15

statute does not, however, impose "a duty to seek credit from every possible lender" before concluding that such credit is unavailable. In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citing Snowshoe, 789 at 1088). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

17.    For the reasons discussed below, the Debtor submits that it has satisfied the standards required to access postpetition financing on a secured superpriority basis under section 364(c) of the Bankruptcy Code.

(i)    **The Debtor Was Unable to Obtain Financing on More Favorable Terms**

18.    The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code. The Debtor faces liquidity restraints and was forced to file the Chapter 11 Case to preserve the value of its assets. The DIP Lenders are the only parties that offered to provide the Debtor with postpetition financing and are willing to lend to the Debtor only on the terms and conditions set forth in the DIP Documents and the DIP Order.

19.    Without the agreement of the DIP Lenders to provide the Debtor with postpetition financing, the Debtor likely would be forced to shut down and liquidate its business.

53653/0001-11447386v8

Instead, with the DIP Financing, the Debtor intends to continue its operations during the Chapter 11 Case.

20.     The Debtor respectfully submits that its efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. See, e.g., Ames Dep't Stores, 115 B.R. at 38 (stating that with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); In re Sky Valley, Inc., 100 B.R. at 113 (noting that where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**(ii)     The DIP Financing is Necessary to Preserve the Assets of the Debtor's Estate**

21.     As debtor-in-possession, the Debtor has a fiduciary duty to protect and maximize its estate's assets.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004).  As noted above, the Debtor requires access to working capital in the form of postpetition financing to continue to operate its business during the Chapter 11 Case.  Absent additional working capital, the Debtor would be forced to liquidate.  Accordingly, the DIP Financing is necessary to preserve the Debtor's assets.

**(iii)    The Terms of the DIP Financing Are Fair, Reasonable and Appropriate Given the Circumstances**

22.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (stating that a debtor may have to enter into hard bargains to acquire funds).

23.     The Debtor's CRO negotiated the DIP Financing in good faith and at arms'-length with the DIP Lenders, resulting in an agreement designed to permit the Debtor to maximize the value of its assets during the Chapter 11 Case.  See, e.g., Snowshoe Co., 789 F.2d at 1088 (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); In re W. Pac. Airlines, Inc., 223 B.R. 567, 573 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of its value and the "immediate collapse of the Debtor as a going concern").  Accordingly, and as set forth in more detail herein, the terms and conditions of the DIP Financing are fair, reasonable and appropriate under the circumstances.

**(iv)**     **Entry Into the DIP Financing Reflects the Debtor's Sound Business Judgment**

24.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); Ames Dep't Stores, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

25.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  See, e.g., U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.), 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); In re

18

DB Capital Holdings, LLC, 454 B.R. 804, 822-23 (Bankr. D. Colo. 2011) (stating that a debtor

must demonstrate, among other things, that the proposed financing is an exercise of sound and

reasonable business judgment).  Further, one court has noted that "[m]ore exacting scrutiny [of

the debtor's business decisions] would slow the administration of the debtor's estate and increase

its cost, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

   26.  Bankruptcy courts generally will defer to a debtor-in-possession's

business judgment regarding the need for and the proposed use of funds, unless such decision is

arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 514 n. 11(a) (Bankr. D.

Utah 1981).  Generally, a court will not second-guess a debtor-in-possession's business decisions

as long as, as a whole, the decisions are within the debtor's sound business judgment.  See In re

Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990); cf. In re Ames Dep't

Stores, Inc., E. Retailers Serv. Corp., et al., 115 B.R. 34, 37–38 (Bankr. S.D.N.Y. 1990) (noting

that courts, in passing upon arrangements for postpetition financing under section 364(b)-(d),

consider, inter alia, whether the terms would tilt the conduct of the bankruptcy case in a manner

inconsistent with chapter 11, or merely reflect a debtor's business judgment).

   27.  As described above, the Debtor has exercised sound business judgment in

determining the appropriateness of the DIP Financing and submits that it has satisfied the legal

prerequisites to incur debt on the terms and conditions set forth in the Term Sheet.  The Debtor

believes that the DIP Financing contains terms that are the best available under the

circumstances, and that the funds provided by the DIP Financing are essential to enable the

Debtor to operate during the Chapter 11 Case.

19

**B.**    <u>**Modification of the Automatic Stay is Warranted**</u>

28.    The proposed DIP Order describes certain circumstances under which the automatic stay could be vacated without further order of the Court.  Specifically, the proposed DIP Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the DIP Order, but subject to five (5) business days prior written notice, the automatic stay is modified or vacated to allow the DIP Lenders to terminate the commitments under the Term Sheet, declare all DIP Obligations immediately due and payable and/or take any actions necessary to foreclose or otherwise enforce the DIP Lenders' security interests in or liens on any or all of the DIP Collateral.

29.    The Debtor submits that such stay modification is an essential element of the Term Sheet and the terms of the DIP Facility negotiated with the DIP Lenders, and that the DIP Order provisions modifying the automatic stay provide sufficient protection to the Debtor and other parties in interest.  Accordingly, the Debtor submits that the Court should modify the automatic stay to the extent contemplated by the DIP Financing and the proposed DIP Order.

<u>**WAIVER OF BANKRUPTCY RULE 6004(h)**</u>

30.    To implement the foregoing successfully, the Debtor seeks a waiver of the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

<u>**NO PRIOR REQUEST**</u>

31.    No prior motion for the relief requested herein has been made to this or any other court.

20

## NOTICE

32.    Notice of the Motion will be provided to: (a) the U.S. Trustee; (b) the DIP Lenders; (c) counsel to the Official Committee of Unsecured Creditors in the Chapter 11 Case; and (d) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the DIP Order, substantially in the form attached hereto, (a) authorizing the Debtor to obtain secured postpetition financing; and (b) granting such other and further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
        February 11, 2015

COLE SCHOTZ P.C.

/s/ David R. Hurst
David R. Hurst (I.D. No. 3743)
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Counsel for Debtor and*
*Debtor-in-Possession*

21