**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>EGENIX, INC.,<br><br>                   Debtor. | Chapter 11<br><br>Case No. 14-12818 (BLS)<br><br>**Hearing Date: March 4, 2015, 11:00 a.m.**<br>**Objections Due: February 25, 4:00 p.m.** |

**UNITED STATES TRUSTEE'S MOTION**
**FOR ENTRY OF AN ORDER CONVERTING**
**THE CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b)**

Andrew R. Vara, Acting United States Trustee for Region Three ("U.S. Trustee"), through his counsel, moves the Court for entry of an order converting the case to Chapter 7 under 11 U.S.C. § 1112(b) (the "Motion"), and in support of the Motion states as follows:

1.      This Court has jurisdiction to hear this Motion.

2.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district and specifically authorized to seek conversion or dismissal of a case under Section 1112. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys. Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.      Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Motion.

**PRELIMINARY STATEMENT**

4.      The U.S. Trustee brings this motion to convert because the Debtor lacks a reasonable likelihood of rehabilitation, and further time spent in chapter 11 will only result in

continuing loss to or diminution of the estate.   The Debtor's disclosures to date show a totality

of circumstances demonstrating that the Debtor is beyond rehabilitation and Creditors would be

better served by liquidation of assets by an independent fiduciary under chapter 7.

5.      The case was filed on a Sunday in between Christmas and New Years and without

compliance with local rules applicable to chapter 11 filings.   The creditor matrix was not filed

until late the next day and contains entries like Bergdorf Goodman, Hermes, and Tiffany and

Co., and an assortment of fine restaurants and hotels.   None of these entities would appear

essential or necessary to the Debtor's line of business: cancer research.   The Declaration of

William T. Nolan in Support of Chapter 11 Petition and First Day Pleadings ("Nolan

Declaration") (Dkt. No. 9) partially described the complete disarray of the Debtor's financial

affairs, noting it had been four years since an audit was attempted, and that the books and records

were incomplete and inaccurate.   The extent of the mismanagement became clearer when the

Debtor indicated that the former CEO and chairman of the board of directors paid personal

expenses using the Debtor's funds, rented space in his home to the Debtor through his

management company, and that the Debtor's corporate status had lapsed due to management's

inattention.   The Debtor's testimony at the 341 meeting of creditors further demonstrated the

"deplorable" condition of the Debtor's books and records and the lackluster attempts to properly

sort out the Debtor's obligations from those of its former CEO and chairman.

6.      The replacement of the CEO and Chairman with a CRO does not correct the

management deficiencies in this case.   The CRO and his firm acted as a financial advisor in the

six months leading up to the petition date.   While the CRO became aware of the

mismanagement months before the filing, he allowed business to continue as usual until after the

filing, acknowledging that the former CEO and chairman transferred $150,000 to himself days prior to his removal.   Rather than correct some of the most damaging behaviors of the Debtor's management, the CRO and his firm proposed to engage in some of the very same self-dealing type of conduct, including seeking to act as the Debtor's landlord.[1]

7.       The Debtor's noncash assets are at best contingent.   The Debtor admits it does not know if its technology will work.   The Debtor does not actively engage in research and development activities on its own, but rather has three contractor agreements with other entities and is in the process of negotiating a fourth to actually conduct the research necessary to determine whether its technology will work. Obtaining debtor in possession financing to encumber the $500,000 of unencumbered cash available to pay dividends to the alleged $3.6 million in unsecured claims does not make sense under the circumstances.   Additionally, the former CEO is a guarantor on approximately $2 million of the unsecured claims.   A chapter 7 trustee is better suited to liquidate the assets of the Debtor and pursue causes of action against former management and other third parties that would allow for the greatest distribution to unsecured creditors.   The Trustee would also be able to sell the intellectual property which would allow for the research to continue.   The Debtor's lack of accurate records and mismanagement by former and current management, coupled with the speculative nature of the Debtor's research, suggest the creditors of this estate would be best served by an independent chapter 7 trustee.   Chapter 11 is an expensive undertaking, and not one well suited to the "wait and see" approach the Debtor has adopted in this case.

---

[1] Although the U.S. Trustee has consensually resolved the issues in regards to the CRO's retention, this does not alter the conduct that took place.

**FACTS**

8.      On December 28, 2014, the Debtor filed its voluntary petition under Chapter 11. The U.S. Trustee appointed an official committee of unsecured creditors in this case on January 22, 2015.    The Debtor is a privately held biotechnology company focused on the development of innovative cancer therapeutics.    Egenix, Inc. ("Egenix") was founded by Donald C. Fresne ("Mr. Fresne").    Mr. Fresne served as the CEO and Chairman of the Board of Directors for the Debtor until December 2014.    Egenix was originally incorporated in Delaware on April 24, 1991 under the name of Epigen, Inc.[2]

9.      The Debtor filed motions to retain counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") (Dkt. No. 17); to retain Donlin Recano as an administrative agent (Dkt. No. 27); to retain Devonshire Holdings, Inc. ("Devonshire") and William T. Nolan ("Mr. Nolan") as Restructuring Advisor and Chief Restructuring Officer for the Debtor (Dkt. No. 31); to establish procedures for interim compensation (Dkt. No. 28); and to set a bar date (Dkt. No. 32).

**Initial Issues with the Filing and Acknowledgment of Problems with the Debtor's Books and Records**

10.      The Debtor filed a bare bones petition on an outdated official form, and did not file a creditor matrix until late on December 29, 2014.    The Creditor matrix contained over 250 entries, including Bergdorf Goodman, Hermes, and Tiffany and Co.    Contrary to Local Rule 1002-1(c), counsel for the Debtor did not contact the U.S. Trustee two business days prior to filing the voluntary petition.

---

[2] According to public files located on the U.S. Securities and Exchange Commission website, Epigen was a public company during the approximate period 1998-2002.

11.     A First Day hearing was held on January 6, 2015, for the Debtor to seek limited interim relief to continue using its existing cash management system and to retain Donlin Recano as claims agent.    Accompanying the first day motions was the Nolan Declaration, which indicated that the Debtor has approximately $3.6 million of unsecured debt, with $2 million of that amount owed to Denan, Inc. under the terms of a promissory note (the "Denan Note").    Mr. Fresne is a personal guarantor on the Denan Note.    The remaining $1.6 million is owed to various other creditors.    The Debtor does not have any secured debt.    As of the petition date the Debtor had approximately $600,000 in its bank account.

12.     Paragraph 22 of the Nolan Declaration set forth:

> (i) the Debtor had not been consistently paying its debts as they matured; (ii) the Debtor's books and records, including its financial statements, were incomplete and inaccurate; (iii) there were few if any accounting controls in place; and (iv) there had been no corporate audit since 2010. While these issues are correctable—and indeed are being corrected—they limit the Debtor's ability in the short term to raise additional capital.

13.     The purported objective of filing the chapter 11 case as set forth in the Nolan Declaration was to restructure the balance sheet to facilitate raising additional capital investment to fund operations and ongoing research.    Nolan Declaration at ¶ 24.    Devonshire Holdings, Inc. ("Devonshire") and William T. Nolan ("Mr. Nolan") were retained prepetition as investment banker and financial advisor to the debtor to assist in raising additional capital.    *Id.* at ¶¶ 3, 20-23.    Devonshire and Mr. Nolan were unable to attract new capital investment prior to the filing of the petition.    *Id.* at ¶¶ 20-23.

**The Debtor's Subsequent Disclosures Indicate Significant Prepetition Mismanagement**

14.    The U.S. Trustee held a telephonic Initial Debtor Interview ("IDI") with the Debtor and its counsel on January 9, 2015.    Ms. Diane Giordano, Bankruptcy Analyst, led the interview for the U.S. Trustee; the Declaration of Diane Giordano ("Giordano Declaration") is attached hereto as Exhibit 1.    During the IDI the Debtor admitted it had replaced Donald Fresne as chairman of the board of directors on December 18, 2014.[3]    The Debtor indicated that Mr. Fresne had been rather poor at keeping the Debtor's books and records, and that Nicholas Rossettos, the Debtor's former CFO, had been responsible for the books and records for the past three to four years ending in 2014 when he was dismissed by management from his position.[4]

15.    During the IDI the Debtor indicated that Mr. Fresne had through his management company, Dutchess Management, rented space to the Debtor at his personal residence for $5,000 per month until the arrangement was terminated in December 2014.    The Debtor produced a lease between Dutchess Management and the Debtor from May 1, 1991, set to terminate in the year 2000, that required the Debtor to pay, $1,900 per month (subject to periodic adjustments) in rent. A copy of the lease produced is attached to the Giordano Declaration as Exhibit H.    The Debtor indicated that it has been unable to find any subsequent modifications or extensions of the lease.[5]    Devonshire initially proposed in its retention Application to act as the Debtor's landlord and sought to charge $1,500 to rent space in its offices.    Devonshire's offices are located on the same parcel as Mr. Nolan's personal residence.

---

[3] At the 341 Meeting, Mr. Nolan testifying on behalf of the Debtor indicated that the decision to remove Mr. Fresne had occurred at a Board meeting on December 14, 2014.   At present it is unclear which date was effective for his removal.

[4] According to the SOFA (Dk. No. 50) answer to question 19, Nicholas Rossettos kept the books and records from June 2007 to September 2014.

[5] Other representations regarding the amount of the rent payment have run as high as $5,800.

16.     The Debtor also indicated that Mr. Fresne ran the company essentially "out of his back pocket," putting money in and taking it out as needed to pay personal expenses. Mr. Fresne is still associated with the Debtor as its Chairman Emeritus.   Based on the financial documents provided at the throughout the case and the statements relating to Mr. Fresne's disregard of corporate formalities, it is possible that there are significant potential claims against Mr. Fresne as a result of his conduct.

17.     Mr. Nolan explained at the February 3, 2015 Continued 341 Meeting, that the Debtor did not file tax returns from 2011 through 2013.   The returns were eventually filed in August or September of 2014.   Additionally, the Debtor's corporate status had lapsed at some point in the past several years. Mr. Nolan explained that management was unable to determine exactly how long the Debtor's corporate status was void for due to the nonpayment of franchise taxes and fees.   According to Mr. Nolan the Debtor had overpaid franchise taxes and fees at some point several years ago, and did not resume paying them once the balance became due and owing again.   The lapse was remedied on approximately July 16, 2014, after some years of void status.

**The Debtor's Assets Are Contingent and Will Require Significant Additional Investment before They Can Generate Any Revenue**

18.     At the IDI the Debtor indicated that other than the approximately $600,000 in its account, its other assets are very contingent, requiring successful completion of an extensive patent process with high professional costs.   Until and unless the research and development of the Debtor's intellectual property is successful and it passes further hurdles to be ready for medical use, the Debtor will not generate any revenue.   The Debtor explained that filing for a patent will take three (3) months at least, and the cost to process one patent would run from

$25,000 to $75,000 and for multiple molecules the cost would likely be in the hundreds of thousands.    No timetable or cost estimate was provided for actually getting any product to market.    If the testing is not successful, this case has no assets of material value other than cash and chapter 5 claims.    If the testing is successful the Debtor will need to raise substantial sums to complete the patent process and then undergo further rigorous testing before a product can be marketed.    The Debtor only has one employee who provides secretarial services.    The task of research and development of the cancer therapeutics is left to research organizations with which the Debtor has independent contractor agreements.    The contractors are the entities responsible for the actual development of the cancer therapeutic technology.

19.      The Debtor indicated that it has a monthly burn rate of approximately $300,000, which will only allow for two months of operation before its existing cash is exhausted.    The Debtor intends to seek debtor in possession financing.

**Substantial Prepetition Transfers to Insiders Leading Up to Bankruptcy**

20.      Schedules and the Statement of Financial Affairs ("Schedules and SOFA") (Dkt. No. 49 & 50) were filed on January 23, 2015.    SOFA question 3c. showed thirty-five (35) transfers to Mr. Fresne totaling $320,753.70 in the year preceding the filing, including $150,000 transferred either just three days before Mr. Fresne was removed from his position as President and Chairman of the Board or one day after he was removed.[6]    Nineteen (19) transfers totaling $56,570.00 were made to Dutchess Management in the year preceding the petition.    In total, the

---

[6] The testimony from the 341 contradicts the Debtor's earlier statement during the IDI.

SOFA shows $377,323.70 was transferred to Mr. Fresne or Dutchess in the year preceding the petition.[7]

21.    At the 341 Meeting, Mr. Nolan indicated that the $150,000 payment made on December 15, 2014 to Mr. Fresne, occurred without the Board or his permission or knowledge. Mr. Nolan testified that notice of a Board Meeting to be held December 14, 2014 was given on December 12, 2014.  On December 13 in anticipation of that meeting, Mr. Fresne as an authorized signatory for the Debtor's account, authorized the withdrawal of the $150,000, and the transaction posted on December 15.  Mr. Nolan indicated that during the December 14 Board Meeting, the Board decided to remove Mr. Fresne from his positions as CEO and chairman of the Board, and to appoint Mr. Nolan as CRO.[8]  When asked why the Debtor did not recover the $150,000 from Mr. Fresne, Mr. Nolan indicated that Mr. Fresne would not return the funds because the money was owed to him.  Despite all of Mr. Fresne's past activity the Debtor acknowledged that it is still contemplating entering into a consulting agreement with him.

22.    Balance sheets and tax returns produced in connection with the IDI showed that the current chairman of the board of directors Lionel Goldfrank III ("Mr. Goldfrank"), received over $1.1 million between December 31, 2012, and December 31, 2013.  A copy of the financial statements showing the debts owed to Mr. Goldfrank is attached to the Giordano Declaration as Exhibit B.  This all took place while the Debtor "had not been consistently paying its debts as they matured."  Nolan Declaration at ¶ 22.

23.    The application to retain Devonshire disclosed that the firm received $40,000 in satisfaction of amounts owed to it for services provided to the Debtor prepetition.  Upon further

---

[7] Testimony adduced at the 341 indicates that this may not be the totality of transactions made for Mr. Fresne's personal benefit.
[8] Other statements have indicated that Mr. Fresne was removed effective December 18, 2014.

inquiry the U.S. Trustee received a copy of an engagement letter dated May, 22, 2014 (the "May

22 Engagement Letter"), between the Debtor and Devonshire for the prepetition services, a copy

of which is attached to the Giordano Declaration as Exhibit I.   The May 22 Engagement Letter

indicated that Devonshire would accrue a monthly advisory fee of $20,000 that would not be

payable until at least $4 million of capital funding was obtained.   The $40,000 payment was

made to Devonshire on December 26, 2014.   Devonshire could not produce an invoice for the

amount.   Debtor's counsel instead informed the U.S. Trustee that there had been an oral

agreement to pay Devonshire monthly, that the balance of the debt to Devonshire was $140,000

at the time of the petition, but that Devonshire had compromised to accept $40,000 in full and

complete satisfaction of the amount owed. The May 22 Engagement Letter contains a merger

clause requiring any modification to the engagement to be in writing executed by the parties.

Devonshire agreed to treat the $40,000 as a postpetition retainer in the engagement order entered

by the Court to resolve the U.S. Trustee's concerns regarding Devonshire's retention.

**The Debtor Does Not Know the Full Extent of Claims that May Be Asserted Against It, Cannot Properly Distinguish Valid Claims from Improper Ones, and Does Not Have Possession of All Books and Records**

24.     As was indicated at the hearing on January 6, 2015, and by its motion filed

January 12, 2015, the Debtor seeks to establish a rapid bar date.   At the IDI, Debtor's counsel

explained that one of the reasons for doing so was that the books and records are in such a state

that having a rapid bar date will allow them to figure out the claims against the estate.

25.     The Debtor has admitted that it does not currently have a plan of reorganization in

formulation, but instead is waiting for the requested bar date to pass so that it can ascertain what

will be needed to formulate, negotiate, and confirm a plan of reorganization.   *See* Dkt. No. 32 at

¶ 9 ("The Debtor's goal is to formulate, negotiate and confirm a plan of reorganization as soon as practicable in the Chapter 11 Case. To facilitate this goal, the Debtor will require complete and accurate information regarding the nature, validity, amount and status of all claims and Interests that will be asserted in the Chapter 11 Case.").

26.    On January 22, 2015, the U.S. Trustee appointed an unsecured creditors committee. (D.I. 46)    During the formation meeting, one of the creditors, Eric J. Ende, M.D. ("Mr. Ende"), (a former board member) provided the U.S. Trustee with a letter dated February 16, 2012 that was addressed to the Egenix Board of Directors.    The letter raised concerns about Mr. Fresne's misuse of company funds for his personal use, e.g., $53,000 interest on a JP Morgan loan, $8,500 for Mr. Fresne's mortgage, $5,800 to Mr. Fresne for the Debtor's monthly rent, $700 for Mr. Fresne's residential electric bill, $4,200 for a social club, $1,000 lease payment for Fresne's Range Rover, among other significant travel and entertainment expenditures.    Mr. Ende reminded the board of its fiduciary responsibilities and expressed that the Board was not fulfilling its obligations.    A copy of the letter is attached to the Giordano Declaration as Exhibit F. The Debtor acknowledged the existence of the 2012 Ende Letter during the 341 Meeting of Creditors on February 3, 2015.

27.    The Schedules indicated that total liabilities exceed $3,920,611.32, and all but four entries on Schedule F were marked as "Disputed."    See Dkt. 49.    While the Creditor matrix contained over 250 entries, only 47 creditors were listed on Schedules E & F, with 30 additional entries on Schedule G, some of which were listed as creditors on Schedule F.

28.    At the 341 Meeting, the U.S. Trustee inquired regarding the Global Notes preceding the Schedules and SOFA. The Global Note 4, Liabilities, states, "The Debtor has

sought to allocate liabilities between the pre-petition and post-petition periods based on the information and research that was conducted in connection with the preparation of the Schedules and SOFA."    The U.S. Trustee inquired about this statement at the 341 Meeting and Mr. Nolan responded that he did not think that they would have trouble distinguishing between pre- and post-petition debts.    Global Note 11, Excluded Assets and Liabilities, states, "The Debtor has excluded certain accrued liabilities, including accrued salaries, employee benefits, and tax accruals from the Schedules and SOFA."    The U.S. Trustee inquired about this statement at the 341 Meeting.    Mr. Nolan responded that, because there were "no records available," any claims asserted against the Debtor, by Mr. Fresne or Rossettos, would be determined based on a review of their proof of claims and supporting documents.

29.    The U.S. Trustee also inquired about specific entries on Schedule F.    Schedule F lists Averion International Corp. as a creditor owed $20,927.30.    When asked if the Debtor knew when the claim originated, Mr. Nolan indicated that he did not.    A press release by Aptiv Solutions June 1, 2011 indicated that Averion had merged with other entities on that date to become Aptiv Solutions.    Aptiv Solutions was not included on the Debtor's creditor matrix. The Debtor responded similarly to a question about Charles River's (fka MIR Preclinical) claim.

30.    At the 341 Meeting the Debtor stated on numerous occasions that it had no way of knowing which, if any, of the a number of entries on its general ledger were legitimate business expenses as opposed to personal expenses of Mr. Fresne and if any utility payments were apportioned for the space used by the Debtor in Mr. Fresne's home. *See* Giordano Declaration at ¶ 19.    When asked whether certain expenses were Fresne's personal expenses or company expenses, the CRO stated that there were no supporting statements or documents to make such

determination and Mr. Fresne "may" have receipts that he could produce to justify that certain such expenses are for the benefit of the company. As recorded on the general ledger, the alleged personal expenses are charged to the company without any proof that the expenses benefit the company. Such "personal" expenses were paid by the secretary at the direction of Mr. Fresne. With respect to certain "club" expenses, Mr. Fresne instructed the secretary or other person to pay him directly and Mr. Fresne would, in turn, pay the "club" expenses from his own account.

31.    The U.S. Trustee inquired as to the nature of the numerous payments to Mr. Fresne listed on SOFA 3c., and not on the general ledger. Mr. Nolan responded that he did not know the nature of the several payments and that the other payments represented repayments of loans. *See* Giordano Declaration at ¶ 19. As indicated in the Giordano Declaration, there is not a clear line delineating what transfers were reported as being made to Mr. Fresne and others, which while made to third parties, were made for his benefit and would properly be considered transfers to Mr. Fresne. *See* Giordano Declaration at ¶¶ 19-22.

32.    At the 341 Meeting, Mr. Nolan stated that the books and records reconciliation process is on-going and that without the underlying supporting documents and invoices, the Debtor is attempting to reconstruct the records using only the bank statements and existing QuickBook entries. Throughout the 341 Meeting Mr. Nolan commented on the "deplorable" state of the books and records.

33.    Additionally, Mr. Nolan acknowledged that the historical records, as well as the computer Mr. Fresne used are still in Mr. Fresne's possession and control, either at his house or a storage unit to which only Mr. Fresne has access.

**BASIS FOR RELIEF**

34.     This case should be converted pursuant to 11 U.S.C. § 1112(b)(1), which provides:

> Except as provided in paragraph (2) and subsection (c), on request
> of a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss
> a case under this chapter, whichever is in the best interests of
> creditors and the estate, for cause unless the court determines that
> the appointment under section 1104(a) of a trustee or an examiner is
> in the best interests of creditors and the estate.

35.     A nonexhaustive list of grounds constituting "cause" are provided in 11 U.S.C. § 1112(b)(4), including: "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate;"

36.     Both of those grounds are satisfied under the facts and circumstances of the instant case.   Additionally, the case should be converted to one under chapter 7, as it is in the best interests of the creditors and other parties in interest to have the Debtor's assets liquidated and its causes of action against current and former management by a chapter 7 trustee.

**The Case Must Be Converted for Cause to Avoid Substantial or Continuing Loss to or Diminution of the Estate and Because the Debtor Lacks a Reasonable Likelihood of Rehabilitation**

37.     First, there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation of the Debtor.   "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis."   5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)).   "Under the interpretation of section 1112(b)(1) consistently used in bankruptcy courts, [a] negative cash flow situation alone is sufficient to

establish 'continuing loss to or diminution of the estate." *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 515-16 (8th Cir. 2004).

38.    The Debtor entered bankruptcy in a total state of disarray.  Its efforts to use Devonshire to raise capital outside of bankruptcy were unsuccessful.  The Debtor will have negative cash flows for a substantial period of time while it is still in a research and development phase and must clear significant regulatory hurdles before it can bring any product to the market.

39.    Other than the approximately $500,000 remaining in its account, the Debtor's only other assets are contingent intellectual property interests that will take years and require the investment of substantial amounts of money to become revenue generating assets.  The Debtor indicates that it will seek debtor in possession financing, in order to continue the case to get to April 2015, to see if the intellectual property assets "work" enough to proceed on to the next stage of the long and arduous development process.  Simply getting to April will require $900,000 of funds based on the estimated burn rate in the case, $300,000 more than the Debtor currently has on hand.  There is no guarantee of success, and a failure of the intellectual property will result in the estate's administrative insolvency.  Debtor in possession financing in this situation will serve to deprive all other parties in interest of a chance at any recovery.  If the testing is not successful, this case has no assets of material value other than cash and chapter 5 claims.

40.    The Debtor does not conduct any research and development tasks in house, but rather has contracted with research organizations to do the actual work.  The Debtor produces no revenue, and will have negative cash flows until it can complete Patent and Food and Drug Administration requirements.  The Debtor's balance sheet and continued association with Mr. Fresne would not appear to inspire confidence in potential investors.  Without investment, the

Debtor will have negative cash flows for the foreseeable future, and because of its contingent

assets may never generate revenue.

41.     As the Debtor has admitted on multiple occasions it does not know what the

universe of claims is that will be asserted against it.   Even in the event the intellectual property

"works" to the extent the Debtor can continue in the development process, there is no guarantee

that a consensual plan can be formulated or that the Debtor could satisfy the requirements of

Section 1129 to cram down the plan on objecting parties in interest.

42.     Based on the above facts, the Debtor has a substantial or continuing loss to or

diminution of the estate, and there is an absence of a reasonable likelihood of rehabilitation, which

constitutes cause to dismiss or convert the case under 11 U.S.C. § 1112(b)(4)(A).

**The Case Must Be Converted for Cause Due to Gross Mismanagement**

43.     Gross mismanagement has featured prominently in the Debtor's path to

bankruptcy, and has not been remedied by the retention of the CRO (who acted as a financial

advisor for 6 months prior to becoming CRO).   The original terms of Devonshire and Mr. Nolan's

proposed retention in the case highlight a number of issues, each of which demonstrates the

ongoing management problems.

44.     First and most importantly, Devonshire was aware of the $150,000 payment to Mr.

Fresne on December 15, 2014.   While the timeline is unclear based on the contradictory

statements made at the IDI and 341 Meeting, it is certain that Mr. Fresne received the payment and

did not comply with a request to return the funds.   To have allowed such a large sum in terms of

the Debtor's liquid assets to be withdrawn by an insider and not be repaid upon demand illustrates

that gross mismanagement is ongoing.   All the evidence produced during the case points toward

substantial claims against Mr. Fresne.   However, Mr. Nolan repeatedly stressed that it was

unclear as to whether the myriad of transactions to Mr. Fresne's personal benefit were not

legitimate business expenses.   A chapter 7 trustee will readily be able to pursue such actions and

ably handle liquidating the rest of the Debtor's estate.

45.    Second, Mr. Nolan has failed to secure all of the books and records of the Debtor.

Mr. Nolan admitted that Mr. Fresne has possession of books and records of the Debtor, as well as

the computer on which he worked in his residence and in a storage unit.   Rather than reviewing

those books and records to better ascertain the Debtor's obligations, Mr. Nolan has adopted a wait

and see approach.   It is the Debtor's responsibility to file accurate schedules.   If the Debtor's

records are in such a deplorable state and not properly secured that it cannot identify its creditors,

this is a prime indication that conversion is in the best interests of creditors.   Mr. Nolan is unable

to ascertain legitimate business expenses from the personal expenses of Mr. Fresne.   When asked

about claims that appear to be legitimate business expenses, like that of Averion, Mr. Nolan did

not know when the claim arose.

46.    Third, Devonshire and Mr. Nolan sought and received a $40,000 payment two days

prior to the petition date, which originally was sought to be treated as payment for prepetition

services.   Devonshire agreed to treat the payment as a postpetition retainer after the U.S. Trustee

expressed serious concerns about the payment, and the retention order reflected that compromise.

The facts show that a payment for prepetition services was not even due and owing to Devonshire

and Mr. Nolan.

47.    Fourth, Devonshire and Mr. Nolan proposed further relations resembling those that

plagued the Debtor.   Devonshire and Mr. Nolan proposed to charge the Debtor for rented space in

its office, when all that was required was space for one employee, a computer, and the files it has secured.  $1,500 is surely less than $5,000, but when put in context of the space being in Devonshire's own office which is located on the same parcel as Mr. Nolan's personal residence, the convenience alone of having the Debtor's affairs managed from that site should not have required any extra payment on top of the monthly fee requested of $30,000.   The arrangement as originally contemplated also would have made Devonshire a creditor.

48.     "Cause" has been established under 11 U.S.C. § 1112(b)(4)(A) and (B).  When read together, sections 1112(b)(1) and (2) of the Bankruptcy Code indicate that, if a movant establishes "cause," the Court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate," unless "the court finds and specially identifies unusual circumstances establishing that converting or dismissing the case is not in the best interest of the creditors and the estate." There are no such "unusual circumstances" here, and therefore conversion or dismissal is mandated.

## RESERVATION OF RIGHTS

49.     The U.S. Trustee reserves all rights, remedies and obligations to, amongst other things, complement, supplement, augment, alter, substitute and/or modify this Motion and to conduct any and all discovery as may be required or deemed necessary, and to assert such other grounds as may become apparent.

50.     This chapter 11 case features extensive evidence of gross mismanagement by former and current management.  The structure of the company and the current state of its intellectual property leave the Debtor unable to reorganize.   Each day spent in chapter 11 presents

a continuing loss and diminution in value to the estate, as the average daily burn rate is $10,000 per

day. If allowed to stay in chapter 11 the funds in the estate will be exhausted by the beginning of

March, leaving the estate administratively insolvent and the Creditors with little chance for a

recovery.

51.    Conversion will allow a chapter 7 trustee to orderly liquidate the Debtor's assets,

pursue causes of action against current and former management, and prevent ongoing diminution

in value of the assets of the estate. On these facts, it appears that conversion would be in the best

interests of creditors.

WHEREFORE, the U.S. Trustee respectfully requests that the Court enter an order

dismissing the case or converting it to a case under chapter 7 of the Bankruptcy Code, and/or such

other relief as this Court deems appropriate, fair and just.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**


Dated: February 11, 2015          **BY:** _/s/   Timothy J. Fox_
                                   Timothy J. Fox, Jr.
                                   Trial Attorney
                                   Office of the United States Trustee
                                   J. Caleb Boggs Federal Building
                                   844 King Street, Suite 2207, Lockbox 35
                                   Wilmington, DE 19801
                                   (302) 573-6491
                                   (302) 573-6497 (Fax)
                                   Email: Timothy.Fox@usdoj.gov