## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- x

In re:

EGENIX, INC.,

Debtor.[1]

---------------------------------------------------- x

Chapter 11

Case No. 14-12818 (BLS)

**Bid Proc. Hrg. Date: 6/19/15 at 9:30 a.m. (ET)**
**Bid Proc. Obj. Deadline: 6/17/15 at 12:00 p.m. (ET)**
**Sale Hrg. Date: To Be Determined**
**Sale Obj. Deadline: To Be Determined**

### DEBTOR'S MOTION FOR (I) ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; (B) APPROVING BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE; AND (D) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF THE SALE AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (II) ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (B) ASSUMPTION AND <u>ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS</u>

Egenix, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Debtor</u>"), hereby moves (the "<u>Motion</u>"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 6004-1 and 9006-1(e) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), for (I) an order (the "<u>Bidding Procedures Order</u>") substantially in the form attached hereto as <u>Exhibit A</u> (A) approving the Debtor's proposed bidding procedures (the "<u>Bidding Procedures</u>") attached to

---

[1]     The last four digits of the Debtor's federal tax identification number are 0172. The mailing address for the Debtor is 2363 Clove Road, LaGrangeville, NY 12540.

the Bidding Procedures Order as <u>Exhibit 1</u> to be employed in connection with the proposed sale of substantially all of the Debtor's assets (the "<u>Acquired Assets</u>") to Denan, Inc. ("<u>Denan</u>") or a designated affiliate (the "<u>Stalking Horse Purchaser</u>") pursuant to the Asset Purchase Agreement, by and between the Debtor (the "<u>Seller</u>") and the Stalking Horse Purchaser (the "<u>Stalking Horse Agreement</u>," a copy of which is attached hereto as <u>Exhibit B</u>);[2] (B) approving the Break-Up Fee and Expense Reimbursement in the Stalking Horse Agreement (together, the "<u>Bid Protections</u>"); (C) scheduling an auction (the "<u>Auction</u>") and a hearing to consider approval of the sale of the Acquired Assets (the "<u>Sale Hearing</u>"); and (D) approving a notice substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> of the respective date, time and place for the Auction and the Sale Hearing (the "<u>Sale Notice</u>") for approval of the sale of the Acquired Assets and the assumption and assignment of certain executory contracts as set forth in the Stalking Horse Agreement (the "<u>Assigned Contracts</u>"); and (II) an order (the "<u>Sale Order</u>")[3] authorizing (A) the sale of the Acquired Assets to the Stalking Horse Purchaser, or to the bidder making the highest or otherwise best bid (the "<u>Successful Bidder</u>") at the Auction, free and clear of liens, claims and encumbrances (other than with respect to Assumed Liabilities); and (B) the Debtor's assumption and assignment of the Assigned Contracts pursuant to and as described in the Stalking Horse Agreement.  In support of the Motion, the Debtor respectfully represents as follows:

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

[3]    The Sale Order will be finalized and filed with the Court prior to the Sale Hearing.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Rules 6004-1 and 9006-1(e).

## INTRODUCTION

3.     The Debtor has been under chapter 11 protection for more than five months, and during that time has continuously sought funding from a wide variety of sources, including funding to consummate a plan of reorganization.  While the Debtor has successfully obtained debtor-in-possession financing to finance the Chapter 11 Case and continue its efforts to develop a viable case exit strategy, the only concrete sale or plan offer to date has come from the Stalking Horse Purchaser, by its offer to purchase the Acquired Assets pursuant to the terms of the Stalking Horse Agreement.

4.     Although the Debtor continues to believe that, as its intellectual property is further tested and validated, other sources of financing and investment would become available to the Debtor, the Debtor recognizes that the timeline to such investment is uncertain—and that the cost to continue its research and development efforts in the interim may be unsustainable.

5.     Accordingly, and in the exercise of its business judgment, the Debtor has concluded that the best way to maximize value for the benefit of its estate and creditors is to sell the Acquired Assets and assume and assign the Assigned Contracts.  Toward this end, the Debtor has negotiated the Stalking Horse Agreement with the Stalking Horse Purchaser to provide for

53653/0001-11859755v4

the sale of the Acquired Assets and for the Debtor's assumption and assignment to the Stalking

Horse Purchaser of the Assigned Contracts.  The transactions contemplated by the Stalking

Horse Agreement are designed to maximize the value of the Debtor's assets for the benefit of its

stakeholders through a prompt sale of the Acquired Assets.  The Debtor seeks to expose the

Acquired Assets to competitive bidding through a four-week marketing process culminating in

an Auction pursuant to the Bidding Procedures.  If there is no higher or otherwise better offer at

the Auction, the Debtor will seek the Court's approval of a sale to the Stalking Horse Purchaser.

      6.     Pursuant to this Motion, the Debtor requests that the Court enter the

proposed Bidding Procedures Order, which approves the Bidding Procedures, the Bid

Protections, the Auction and the Sale Hearing Notice and schedules the Sale Hearing.  Upon

conclusion of the Auction and selection of the highest or otherwise best bid, the Debtor requests

that the Court enter the proposed Sale Order, which authorizes the sale to the Stalking Horse

Purchaser, or alternatively, to the Successful Bidder at the Auction, free and clear of liens, claims

and encumbrances (other than with respect to Assumed Liabilities) and the assumption and

assignment of the Assigned Contracts.

## BACKGROUND

      7.     On December 28, 2014 (the "Petition Date"), the Debtor commenced a

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the

"Chapter 11 Case").  The factual background regarding the Debtor, including its business

operations, its capital and debt structure, and the events leading to the filing of the Chapter 11

Case, is set forth in the Declaration of William T. Nolan in Support of Chapter 11 Petition and

First Day Pleadings [Docket No. 9] (the "First Day Declaration").

      8.     The Debtor continues to manage and operate its business as a debtor-in-

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.     On January 22, 2015, the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") in the Chapter 11 Case pursuant to section 1102(a) of the Bankruptcy Code

[Docket No. 46]. No trustee or examiner has been appointed in the Chapter 11 Case.

### RELIEF REQUESTED

10.     By this Motion, the Debtor respectfully requests, pursuant to sections

105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Rules 6004-1 and 9006-1(e) (I) entry of an order: (A) approving the Bidding Procedures to be

employed in connection with the sale of the Acquired Assets pursuant to sections 363 and 365 of

the Bankruptcy Code; (B) approving the Bid Protections; (C) scheduling the Auction and the

Sale Hearing; and (D) approving the Sale Notice; and, upon conclusion of the Auction and

selection of the highest or otherwise best bid at the Auction, (II) entry of an order authorizing:

(A) the sale of the Acquired Assets free and clear of liens, claims and encumbrances (other than

with respect to Assumed Liabilities); and (B) the assumption and assignment of the Assigned

Contracts.

### THE PROPOSED SALE OF THE PURCHASED ASSETS

**A.     The Stalking Horse Agreement**

11.     A summary of the principal terms of the Stalking Horse Agreement,

including terms that are required to be highlighted pursuant to Local Rule 6004-1, is as follows:[4]

    a.     <u>Purchase Price</u>. Section 3(a) of the Stalking Horse Agreement provides
       that the aggregate purchase price for the Acquired Assets (the "Stalking

---

[4]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse
Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement
and the terms herein, the terms of the Stalking Horse Agreement will govern. Capitalized terms used in
this section of the Motion and not otherwise defined will have the meanings ascribed to them in the
Stalking Horse Agreement.

Horse Purchase Price") shall consist of the following: (i) $817,500 in cash; (ii) the sum $2,367,500 as a credit bid of the amount outstanding on the Denan DIP; (iii) Denan's agreement to take no distribution from the Debtor on account of its unsecured claim arising from the Denan Prepetition Note; and (iv) the agreement of Donald Fresne to release his claims against the Debtor.  The Debtor has determined that the Stalking Horse Purchase Price has an aggregate cash value of $3,885,000.

b.     <u>Acquired Assets</u>.  Section 2(a) of the Stalking Horse Agreement provides that the Stalking Horse Purchaser will acquire the following assets of the Debtor, free and clear of Liens and Pre-Closing Liabilities: (i) all Seller Company IP; (ii) the Assumed Agreements, to the extent the same are assignable under section 365 of the Bankruptcy Code or to the extent assignment is consented to by the counterparties to such agreements; (iii) subject to any and all applicable restrictions on the assignment of software licenses, all Equipment of the Debtor; (iv) subject to any and all applicable restrictions, all of Debtor's currently allocated, assigned, used and unused IP Addresses and Autonomous System Numbers; (v) all products and materials under any stage of research, development, production, sale, distribution or Exploitation by the Debtor; (vi) all right, title and interest in and to all Technology and Clinical Data owned, licensed or otherwise held by the Debtor; (vii) all Governmental Authorizations and Permits; (viii) all investigational new drug applications, biologics license applications, other product license applications and product licenses; (ix) all items of inventory, wherever located; (x) certain insurance policies (including clinical trial insurance policies) and rights thereunder of the Debtor to the extent related to the period prior to Closing; (xi) all rights and remedies under all warranties, representations and guarantees made by suppliers, manufacturers and contractors; (xii) all rights under non-disclosure and confidentiality agreements for the benefit of the Debtor with current or former employees and agents of the Debtor or with third parties; and (xiii) all other equipment, circuits, information and lists owned by the Debtor and required for the operation of the Debtor's current Business.

c.     <u>Excluded Assets</u>.  Section 2(b) of the of the Stalking Horse Agreement provides that the Stalking Horse Purchaser will not acquire the following assets of the Debtor: (i) any accounts receivable related to any current or former customers as of 12:01 a.m. on the day of the closing of the sale transaction; (ii) any cash or equity securities; (iii) all claims for preference and avoidance actions pursuant to Chapter 5 of the Bankruptcy Code and all of the Debtor's claims against current or former directors, officers or employees of the Debtor (other than the Debtor's claims against Donald Fresne, Denan and Denan's principals which shall be released in connection with the sale transaction); and (iv) any other asset that is not described in Section 2(a) of the Stalking Horse Agreement.

6

d.    <u>Released or Waived Claims</u>. As noted above, as part of the consideration for the Sale, the Stalking Horse Purchaser has agreed to waive distribution on account of Denan's unsecured claim of in excess of $2.1 million, which is one of the largest unsecured claims asserted against the Debtor. The Stalking Horse Purchaser also is negotiating an agreement with the Debtor's former Chief Executive Officer, Donald Fresne, pursuant to which Mr. Fresne will release his claims against the estate, which have been asserted in an amount in excess of $5.8 million.

e.    <u>Assumed Liabilities</u>. Section 2(c) of the of the Stalking Horse Agreement provides that the Stalking Horse Purchaser will assume and agree to discharge solely the Liabilities of the Debtor under the Assumed Agreements that are not Pre-Closing Liabilities, but arise after the actual assumption of each such Assumed Agreement on the Closing Date and all Liabilities related to the Acquired Assets arising from any actions or omissions of Buyer occurring after the Closing Date.

f.    <u>Excluded Liabilities</u>. Section 2(d) of the of the Stalking Horse Agreement provides that, other than the Assumed Liabilities or as expressly provided in the Stalking Horse Agreement, the Stalking Horse Purchaser will not assume or be obligated or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities of the Debtor whatsoever.

g.    <u>Termination</u>. Section 12(a) of the Stalking Horse Agreement provides for termination of the agreement prior to the Closing as follows: (i) by mutual written agreement of the Parties; (ii) by the Stalking Horse Purchaser if the Bidding Procedures Order has not been entered on or before June 19, 2015 and (iii) by either party if the Sale Order has not been entered on or before July 24, 2015 or if the Closing Date shall not have occurred on the date specified in Section 4(a) of the Stalking Horse Agreement.

h.    <u>Agreements with Management</u>. There are no contracts or agreements between the Stalking Horse Purchaser and the Debtor's management. The Stalking Horse Purchaser is, however, seeking to negotiate and enter into contractual arrangements with various of the Debtor's consultants.

i.    <u>Sale to Insider</u>. The Stalking Horse Purchaser is an entity controlled by Dendy Young and Andrea Young, both of whom are members of the Debtor's board of directors. The Stalking Horse Purchaser also is a significant unsecured lender of the Debtor and a shareholder of the Debtor.

j.    <u>Private Sale/No Competitive Bidding</u>. As stated above, the Debtor seeks to expose the Acquired Assets to competitive bidding through a four-week marketing process culminating in an Auction pursuant to the Bidding Procedures. If there is no higher and better offer at the Auction, the Debtor will support a sale to the Stalking Horse Purchaser.

k.      Closing and Other Deadlines.  As set forth in Section 4(a) of the Stalking Horse Agreement, the Closing will take place no later than two business days after the Sale Order becomes a final order; provided, however, that the Stalking Horse Purchaser can, in its sole discretion, waive the condition that the Sale Order become final prior to Closing in which case the Closing Date shall occur three (3) business days after written notice thereof has been provided by the Stalking Horse Purchaser to the Debtor.

l.      Good Faith Deposit.  None.

m.      Interim Arrangements with Stalking Horse Agreement.  Pursuant to a separate agreement, the Stalking Horse Purchaser has agreed to provide interim financing to fund the sale process.

n.      Use of Proceeds.  The proceeds of the sale will be used to fund winddown expenses of the Debtor's estate and provide a distribution to holders of general unsecured claims.

o.      Tax Exemption.  None.

p.      Record Retention.  Pursuant to Section 8(c) of the Stalking Horse Agreement, the Acquired Assets include all original documentation and information related to the Acquired Assets, including regulatory filings for all the products, and including any master drug files, establishment license applications, investigational new drug applications, new drug applications, and biologic license applications.  After the Closing, the Stalking Horse Purchaser will allow the Debtor reasonable access to all business records and files that are transferred in connection with the sale transaction, which are reasonably required by the Debtor in order to complete the Chapter 11 Case or for tax or other valid business purposes.

q.      Sale of Avoidance Actions.  Pursuant to Section 2(b) of the Stalking Horse Agreement, the Debtor's avoidance actions pursuant to Chapter 5 of the Bankruptcy Code are excluded from the sale.

r.      Requested Findings as to Successor Liability.  The Debtor will seek a finding in the Sale Order that the Stalking Horse Purchaser is not a successor of the Debtor.

s.      Credit Bid.  As set forth above, the Purchase Price includes a credit bid in the amount of the debtor-in-possession financing being provided by the Stalking Horse Purchaser.

t.      Releases.  Pursuant to Sections 4(d) and 8(b)(ii)(B) of the Stalking Horse Agreement, the Debtor has agreed to release (i) the Stalking Horse Purchaser, its principals and each of their affiliates and (ii) Donald Fresne in connection with the sale transaction.

8

u.      Request for Bankruptcy Rule 6004(h) Waiver. As set forth below, the
Debtor is requesting a waiver of the fourteen (14) day stay imposed by
Bankruptcy Rule 6004(h).

**B.     Bidding Procedures**

12.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside

the ordinary course of business may be by private sale or by auction.  The Debtor believes that

good cause exists to expose the Acquired Assets to sale at auction and to approve the procedures

proposed herein.  An auction conducted substantially in accordance with the Bidding Procedures

will enable the Debtor to obtain the highest or otherwise best offer for the Acquired Assets,

thereby maximizing the value of the estate.

13.     The Debtor will permit existing interested parties and any new prospective

purchasers to perform reasonable due diligence with respect to the Acquired Assets and will

assist them with such efforts.  This process will culminate in an Auction prior to the Sale

Hearing, at which time a sale of the Acquired Assets to either the Stalking Horse Purchaser or

the Successful Bidder will be submitted to the Court for its approval.

14.     While all interested bidders should read the Bidding Procedures in their

entirety, the following describes the salient points of the Bidding Procedures and discloses

certain information required pursuant to Local Rule 6004-1:[5]

a.      Bid Requirements. Any bid by a Bidder must be submitted in writing and
determined by the Debtor, in consultation with the Consultation Parties, to
have satisfied the following requirements:

(1)     Good Faith Deposit. Each Bid must be accompanied by a deposit
in the amount of ten percent (10%) of the purchase price contained
in the Modified Asset Purchase Agreement, to an escrow account

---

[5]     The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.
In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein,
the terms of the Bidding Procedures will govern.  Unless otherwise defined in the summary set forth in the
accompanying text, capitalized terms will have the meanings ascribed to them in the Bidding Procedures.

9

to be identified and established by the Debtor (the "Good Faith Deposit").

(2)    Executed Agreement.  Each Bid must be based on the Stalking Horse Agreement and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "Modified Asset Purchase Agreement").  A Bid also must include a copy of the Stalking Horse Agreement marked against the Modified Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser).

(3)    Minimum Bid.  A Bid must have a purchase price that in the Debtor's business judgment has a value of at least $4,235,000 (the "Minimum Bid"), which is the sum of (1) $3,885,000 (as defined above, the "Stalking Horse Purchase Price") plus (2) $250,000 (the "Bid Protections Amount") plus (3) $100,000.

(4)    Designation of Assigned Contracts.  A Bid must identify with particularity each and every executory contract with respect to which the Bidder seeks assignment from the Debtor.

(5)    Corporate Authority.  A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; provided that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(6)    Disclosure of Identity of Bidder.  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid also must fully disclose any connections or agreements with the Debtor, the Stalking Horse Purchaser or any other known, potential or prospective Bidder or Qualified Bidder, and/or any officer, director or equity holder of the Debtor.

10

(7)     <u>Proof of Financial Ability to Perform</u>.  A Bid must include written evidence that the Debtor may conclude, in consultation with its advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.

(8)     <u>Contact Information and Affiliates</u>.  The Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(9)     <u>Contingencies</u>.  Each Bid (1) may not contain representations and warranties, covenants or termination rights materially more onerous in the aggregate to the Debtor than those set forth in the Stalking Horse Agreement and (2) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(10)    <u>Irrevocable</u>.  Each Bid must be irrevocable until five (5) business days after the Sale Hearing, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid will continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(11)    <u>Compliance with Diligence Requests</u>.  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtor to the satisfaction of the Debtor.

(12)    <u>Confidentiality Agreement</u>.  To the extent not already executed, the Bid must include an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor.

(13)    <u>Termination Fees</u>.  The Bid must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

(14)    <u>Closing Date</u>.  The Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by August 10, 2015.

53653/0001-11859755v4

(15)    <u>Qualified Bid</u>.  A Bid received from a Bidder that meets the above requirements will constitute a Qualified Bid for such assets and such Bidder will constitute a Qualified Bidder.

b.    <u>Bid Deadline</u>.  Each bid must be transmitted in writing (in both PDF and Word format) so as to be actually received by the Debtor, counsel to the Debtor and counsel to the Committee, on or before June 17, 2015 at 5:00 p.m. (Eastern Time) (the "<u>Bid Deadline</u>").

c.    <u>Auction Participation</u>.  The Debtor, the Consultation Parties, the Stalking Horse Purchaser and any other Qualified Bidders, in each case, along with their representatives and counsel, will attend the Auction (such attendance to be in person).  In addition, only the Stalking Horse Purchaser and other Qualified Bidders will be entitled to make Bids at the Auction.

d.    <u>The Auction</u>.  If one or more Qualified Bids, other than the Stalking Horse Agreement, are received by the Bid Deadline, the Debtor will conduct the Auction to determine the Successful Bidder with respect to the Debtor's assets.  If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtor will not conduct the Auction and will accept the Stalking Horse Agreement, in which case the Stalking Horse Agreement will be the Successful Bid and the Stalking Horse Purchaser will be the Successful Bidder.  If one or more Qualified Bids for substantially all of the Acquired Assets are submitted by the Bid Deadline, the Auction will take place on July 20, 2015 at 10:00 a.m. (Eastern Time) at the offices of Cole Schotz P.C., counsel to the Debtor, 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, or such other place and time as the Debtor will designate and notify all Qualified Bidders, the Stalking Horse Purchaser and counsel to the Committee.

e.    <u>Terms of Overbids</u>.  To submit an Overbid, a Bidder must comply with the following conditions:

(1)    <u>Minimum Overbid Increments</u>.  Any Overbid for the Acquired Assets above the Auction Baseline Bid will be made in increments valued at not less than $100,000 in cash or in cash equivalents, or other forms of consideration acceptable to the Debtor, in consultation with the Consultation Parties.

(2)    <u>Remaining Terms Are the Same as for Qualified Bids</u>.  Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; <u>provided</u>, <u>however</u>, that the Bid Deadline will not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in

12

connection therewith.  Any Overbid must remain open and binding on the Bidder.  At the Debtor's discretion, to the extent not previously provided (which will be determined by the Debtor in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

(3)    Backup Bidder.  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its business judgment and after consulting with the Consultation Parties, will be designated the backup bidder (the "Backup Bidder").

f.    Reservation of Rights.  Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtor further reserves the right as it may reasonably determine to be in the best interest of its estate, after consultation with the Consultation Parties, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth in the Bidding Procedures with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth in the Bidding Procedures; (h) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtor's Chapter 11 Case, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtor determines, in its business judgment, after consultation with the Consultation Parties, will better promote the goals of the bidding process and discharge the Debtor's fiduciary duties; provided, however, that any modification or additions to the Bidding Procedures will not be materially inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other order of the Court.

g.    Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders will be held in one or more escrow accounts by the Debtor.  The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder will be returned to such Qualified Bidder

13

not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, will be returned to the Backup Bidder no later than the earlier of (i) 72 hours after the closing of the transaction with the Successful Bidder; and (ii) 30 days after entry of the Sale Order. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit will be credited towards the purchase price.

15. Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value and, as such, do not impair the Debtor's ability to consider all qualified bid proposals. Moreover, as noted, the Bidding Procedures preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtor's estate.

16. The Debtor believes that the foregoing Bidding Procedures provide an appropriate framework for the sale of the Acquired Assets in a uniform fashion and will enable the Debtor to review, analyze and compare all offers received to determine which offer is in the best interests of the Debtor's estate and creditors. Moreover, the Debtor believes that the proposed deadlines and milestones for noticing, marketing and selling the Acquired Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids for the Acquired Assets. Therefore, the Debtor respectfully requests that the Court approve the Bidding Procedures.

## C.    Bid Protections

17. After arm's length negotiations, the Debtor and the Stalking Horse Purchaser agreed to the terms of the Bid Protections. By establishing a minimum acceptable bid, the Stalking Horse Agreement and Bidding Procedures promote competitive bidding and allow the Debtor to maximize the value received through a sale of substantially all of the Debtor's assets. As part of the negotiations, the Debtor has agreed to pay the Stalking Horse Purchaser, in accordance with Section 8(b)(i) of the Stalking Horse Agreement: (a) the Break-up Fee in the

14

amount of $150,000 and (b) the Expense Reimbursement equal to the lesser of (i) $100,000 and

(ii) the aggregate amount of all reasonable and documented out of pocket expenses and fees

incurred by the Stalking Horse Purchaser in connection with the transactions contemplated by

the Stalking Horse Agreement. The Debtor has agreed that its obligation to pay the Bid

Protections pursuant to the Stalking Horse Agreement will, upon entry of the Bidding Procedures

Order, constitute a super priority administrative expense of the Debtor under section 503(b)(1) of

the Bankruptcy Code.

      18.    The Debtor submits that the Bid Protections are fair and reasonable in

light of the circumstances and because, in the event the Bid Protections are triggered, the

Stalking Horse Purchaser's efforts will have increased the chances that the Debtor will receive

the highest or otherwise best offer for the sale of substantially of its assets, to the benefit of the

Debtor's creditors.

**D.    The Sale Notice and Notice of Motion**

      19.    Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify

its creditors of the proposed sale of the Acquired Assets, including disclosure of the time and

place of the Auction, the terms and conditions of the sale, and the deadline for filing any

objections thereto. The Sale Notice contains information required under Bankruptcy Rules

2002(a) and (c), and also includes details about the Bidding Procedures and the procedures for

the submission of competing Bids. This information will enable interested parties to participate

in the Auction and the Sale Hearing if they so choose. The Debtor accordingly requests that the

Court approve the form and content of the Sale Notice.

      20.    The Debtor proposes to serve the Bidding Procedures Order (including the

Bidding Procedures) within two (2) business days after entry of the Bidding Procedures Order,

by first-class mail, postage prepaid, or email, where available, to (a) all entities known to have

expressed an interest in a transaction with respect to the Acquired Assets and such other parties

identified by the Consultation Parties prior to the date hereof; (b) all entities known to have

asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets; (c) all

federal, state and local taxing authorities which have a reasonably known interest in the relief

requested by the Motion; (d) the Office of the United States Attorney for the District of

Delaware; (e) the New York Attorney General's office; (f) the Securities and Exchange

Commission; (g) the Internal Revenue Service; (h) counsel to the Committee; (i) the Office of

the United States Trustee; (j) counterparties to Assigned Contracts; and (k) those parties who

have filed the appropriate notice requesting notice of all pleadings filed in the Chapter 11 Case.

On that date, the Debtor (or its agents) also will serve by first-class mail, postage prepaid, the

Sale Notice upon all known creditors and interest holders of the Debtor.  Finally, the Debtor will

cause notice substantially in the form of the Sale Notice to be published one time in the national

edition of *The Wall Street Journal*, *The New York Times* or *USA Today* within five (5) business

days after entry of the Bidding Procedures Order, or as soon thereafter as practicable.

        21.    The Debtor submits that (a) the notice to be provided through the Sale

Notice and this Motion; and (b) the method of service and publication proposed herein constitute

good and adequate notice of the sale of the Acquired Assets and the proceedings to be had with

respect thereto (including, but not limited to, the Auction and Sale Hearing).  Therefore, the

Debtor respectfully requests that the Court approve the foregoing notice procedures.

**E.**      **Assumption and Assignment of the Assigned Contracts**

        22.    The Stalking Horse Agreement contemplates that the Debtor will assume

and assign the Assigned Contracts to the Stalking Horse Purchaser.  In accordance with the

proposed Bidding Procedures Order and the Stalking Horse Agreement, the Debtor will serve a

cure notice in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "<u>Cure</u>

Notice") on each counterparty to an Assigned Contract and its counsel, if known.  The Cure

Notice will, among other things, (i) state the cure amounts that the Debtor believes are necessary

to assume such Assigned Contracts pursuant to section 365 of the Bankruptcy Code (collectively,

the "Cure Amounts" and, for an individual Assigned Contract, the "Cure Amount"); (ii) notify

the non-Debtor counterparties to such Assigned Contracts that such parties' contracts may be

assumed and assigned to a purchaser of the Acquired Assets at the conclusion of the Auction;

and (iii) state deadlines by which the non-Debtor counterparties to such Assigned Contracts must

file objections to the assumption and assignment of such contracts, including objections to the

Cure Amounts listed on the Cure Notice and the ability of the Successful Bidder to provide

adequate assurance of future performance ("Adequate Assurance") under such Assigned

Contracts; provided, however, that the inclusion of a contract or agreement on the Cure Notice

will not constitute an admission that such contract or agreement is an executory contract.  The

Debtor reserves all of its rights, claims and causes of action with respect to the contracts and

agreements listed on the Cure Notice.

       23.     The Debtor proposes that if no objection to a proposed Cure Amount is

filed with the Court on or before July 10, 2015 at 4:00 p.m. (Eastern Time) and served so as to be

received by the parties designated to receive notice by such deadline, then such Cure Amount

shall be binding upon the non-Debtor counterparty to the Assigned Contract for all purposes, will

constitute a final determination of the Cure Amount required to be paid by the Debtor or the

prospective purchaser in connection with the assignment to the Successful Bidder, and the non-

Debtor counterparty to the Assigned Contact will be forever barred from asserting any other

claims against the Debtor, the Stalking Horse Purchaser or the Successful Bidder (as

appropriate), or the property of any of them, as to the Cure Amount.

24.     If at any time after the entry of the Bidding Procedures Order the Debtor identifies additional prepetition executory contracts and/or unexpired leases to be assumed and assigned as part of the Sale Transaction, the Debtor proposes that it will serve a supplemental Cure Notice in the same matter and on the same parties as the Cure Notice.  A contract counterparty receiving any such supplemental Cure Notice will have until the later of (a) the Sale Objection Deadline (as defined below) or (b) ten (10) days from service of the supplemental Cure Notice to file an objection to the assumption and assignment of its contract(s) and/or leases(s) in accordance with the procedures set forth herein.

25.     The Debtor further proposes that all objections to the proposed sale of Acquired Assets, including (a) objections concerning the assumption and assignment of Assigned Contracts not relating to Cure Amounts and (b) objections relating to the provision of Adequate Assurance, including those based upon the ability by the Stalking Horse Purchaser to provide Adequate Assurance, shall be in writing, state with specificity the basis for the objection and be filed with the Court on or before July 10, 2015 at 4:00 p.m. (Eastern Time) (the "Sale Objection Deadline"), and served so as to be received by the parties designated to receive notice by such deadline.

26.     Finally, the Debtor proposes that, to the extent that the Successful Bidder is not the Stalking Horse Purchaser, no later twenty-four (24) hours after the close of the Auction, the Debtor will serve adequate assurance information provided by the Successful Bidder on the non-Debtor parties to the Assigned Contacts or their counsel (if known) via electronic mail (for parties that have consented to service by electronic mail) or overnight courier, and Non-Debtor parties to Assigned Contracts will have until 4:00 p.m. on the day prior

18

to the Sale Hearing to file objections based upon the ability of any Successful Bidder who is not

the Stalking Horse Purchaser to provide Adequate Assurance.

27.    Any counterparty to an Assigned Contract that fails to timely file and

serve an objection to the proposed assumption and assignment of its contract in accordance with

the Bidding Procedures Order will be forever barred from asserting any objection to the

assumption and assignment of its contract, including asserting additional cure amounts with

respect to the contract relating to any period prior to the time of assumption and assignment.

Further, to the extent that an entity does not timely object to Adequate Assurance, the Debtor

proposes that such entity will be deemed to have agreed that the Successful Bidder has provided

Adequate Assurance within the meaning of section 365 of the Bankruptcy Code and will be

forever barred from requesting additional Adequate Assurance.

## GROUNDS FOR APPROVAL OF THE MOTION

A.    **The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Acquired Assets**

28.    The Debtor believes that the Bidding Procedures are appropriate under

sections 105(a) and 363 of the Bankruptcy Code to ensure that the bidding process is fair and

reasonable and will yield the maximum value for the Debtor's estate and creditors. The Bidding

Procedures proposed herein are designed to maximize the value received for the Debtor's assets

by facilitating a competitive bidding process in which all potential bidders are encouraged to

participate and submit competing bids. The Bidding Procedures provide potential bidders with

sufficient notice and opportunity to acquire information necessary to submit a timely and

informed bid. Thus, the Debtor and all parties in interest can be assured that the consideration

for the Acquired Assets will be fair and reasonable. At the same time, the Bidding Procedures

provide the Debtor with the opportunity to consider all competing offers and to select, in its

19

business judgment, and after consultation with the Consultation Parties (as defined in the

Bidding Procedures), the highest and best offer for the Acquired Assets.  Accordingly, the

Debtor submits that the Court should approve the Bidding Procedures.

29.    Similar procedures have been approved by this Court in other cases.  See

e.g., In re Synagro Technologies, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013);

In re ICL Holding Company, Inc. (f/k/a LCI Holding Company, Inc.), Case No. 12-13319 (KG)

(Bankr. D. Del. Jan. 25, 2013); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D.

Del. Nov. 2, 2012); In re A123 Systems, Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8,

2012).

## B.    The Bid Protections Should Be Authorized

30.    The Stalking Horse Agreement provides that, if the Stalking Horse

Purchaser is not the successful bidder for the Acquired Assets because a higher or otherwise

better bid than that of the Stalking Horse Purchaser is approved by the Bankruptcy Court, the

Stalking Horse Purchaser will be entitled to the Bid Protections.  In connection with the Sale

Transaction, the Debtor seeks authorization to pay the Stalking Horse Purchaser the Break-Up

Fee and Expense Reimbursement in accordance with the terms of the Stalking Horse Agreement.

Approval of break-up fees, expense reimbursements and other forms of bidding protections in

connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has

become established practice in chapter 11 cases.  Such bidding protections enable a debtor to

ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while

providing the debtor with an opportunity to enhance the value received by its estate through an

auction process.  Historically, bankruptcy courts have approved bidding incentives similar to the

Bid Protections pursuant to the "business judgment rule."  See, e.g., Official Comm. of

20

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

31.     The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy context. In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010). The Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. See O'Brien, 527 F.3d at 533.

32.     The aggregate amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Purchaser. Moreover, the Bid Protections are actually necessary to preserve the value of the estate. The Bid Protections were negotiated in good faith and are necessary to secure the Stalking Horse Purchaser's commitment under the Stalking Horse Agreement. In sum, the Debtor's ability to offer the Bid Protections enables it to ensure the sale of the Acquired Assets to the Stalking Horse Purchaser at a price it believes to be fair while, at the same time, providing the Debtor with the potential of even greater benefit to its estate. Moreover, payment of the Bid Protections will not diminish the Debtor's estate. The Bid Protections are only triggered if the Court approves a higher or otherwise better bid, which bid must exceed the consideration offered by the Stalking Horse Purchaser by an amount sufficient to pay the Bid Protections.

53653/0001-11859755v4

**C.    Approval of the Sale is Warranted Under Bankruptcy Code Section 363(b)**

33.    Compelling business justifications exist for the proposed sale of the Acquired Assets pursuant to the Stalking Horse Agreement.  As noted above, the Stalking Horse Agreement represents the only concrete sale or plan offer received by the Debtor during its Chapter 11 Case, and it is unclear whether the Debtor would be able to obtain further financing or investment without additional testing and validation of its intellectual property—which would take time and consume considerable resources.  Accordingly, the Debtor has determined that it is in the best interests of its creditors and estate to sell the Acquired Assets to the Stalking Horse Purchaser according to the Bidding Procedures and other terms and conditions set forth in the Stalking Horse Agreement.  Among other things, the Stalking Horse Agreement provides what the Debtor believes is the best possible opportunity to (a) preserve the going-concern value of the Acquired Assets and (b) obtain the highest value for the Acquired Assets for the benefit of the Debtor's estate and creditors.

34.    Additionally, the Stalking Horse Agreement contemplates that two of the largest unsecured claims against the estate will be waived or released.  If the Stalking Horse Agreement closes, Denan is agreeing not to take a distribution on account of its unsecured claim that is in excess of $2.1 million.  Moreover, Denan is finalizing an agreement with Debtor's former Chief Executive Officer, Donald Fresne, that will result in Mr. Fresne's release of his claims against the estate, which have been asserted in an amount in excess of $5.8 million.  These releases benefit the estate and will provide a greater return to the remaining unsecured creditors.

35.    Notwithstanding the Debtor's belief that the terms of the Stalking Horse Agreement are fair and reasonable, the Acquired Assets will still be exposed to higher and better offers.  The sale of the Acquired Assets pursuant to section 363 of the Bankruptcy Code will

53653/0001-11859755v4

enable the Acquired Assets to be transferred expeditiously, which is necessary to maximize and preserve the going-concern value of the Acquired Assets.

36.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Following the decision in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

37.     The "sound business purpose" test requires a debtor to establish: "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. at 176).

38.     Under the circumstances of this Chapter 11 Case, the Debtor has concluded that the sale of the Acquired Assets represents the best manner in which to maximize the value to creditors of the Debtor's estate and therefore satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under section 363(b) of the

23

Bankruptcy Code.  Preservation of enterprise value for the benefit of all constituencies is a compelling circumstance, and maximization of asset value for the benefit of all creditors is a sound business purpose, warranting authorization of the proposed sale of the Acquired Assets.

39.    The Debtor is confident that its marketing efforts to date have yielded a fair and reasonable price for the Acquired Assets given the early stage of development of the Debtor's intellectual property.  Moreover, the fairness and reasonableness of the consideration to be received from the Stalking Horse Purchaser ultimately will be demonstrated by adequate "market exposure" and an Auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

40.    In addition to representing a fair and reasonable value offered by the Stalking Horse Purchaser, the Stalking Horse Agreement is the product of vigorous arms'-length, good faith negotiations between the Debtor and the Stalking Horse Purchaser.  The negotiations involved substantial time and energy by the parties and their professionals, and the Stalking Horse Agreement reflects a give-and-take and compromises by both sides.

**D.    The Acquired Assets Should be Sold Free and Clear of Liens, Claims and Encumbrances Under Bankruptcy Code Section 363(f)**

41.    The Debtor also submits that the sale of the Acquired Assets should be free and clear of any and all liens, claims and encumbrances that may be asserted by any third party (other than with respect to Assumed Liabilities).  Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

24

11 U.S.C. § 363(f). Since section 363(f) is written in the disjunctive, any of the five conditions, including the "consent" of the lienholders, provides authority to sell free and clear of liens. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988); In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007).

42.    The Debtor is not aware of any liens that may be asserted against the Acquired Assets, aside from the liens granted under the Debtor's debtor-in-possession financing facility provided by the Stalking Horse Purchaser. To the extent that the Stalking Horse Purchaser is not the Successful Bidder at the Auction, such liens will be adequately protected by either being paid in full at the time of closing, or by having such liens attach to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests that the Acquired Assets be transferred to the Stalking Horse Purchaser, or to the Successful Bidder at Auction, free and clear of liens (other than with respect to Assumed Liabilities) with such liens to attach to the proceeds of the sale as set forth herein.

43.    Moreover, to the extent that any other person or entity asserts a lien against the Acquired Assets and does not timely object to the Motion, the Debtor requests that such person or entity be deemed to have consented to any sale approved at the Sale Hearing.

44.    The Debtor also submits that it is appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtor's businesses. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free

and clear from successor liability relating to the debtor's business.  See, e.g., In re Ormet, 2014

WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor

liability claims relating to an under-funded pension plan); In re Tran World Airlines, Inc., 322

F.3d 283, 288-290 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor

liability claims for employment discrimination and rights under travel voucher program); In re

Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtor's

assets free and clear of certain taxes); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D.

Del. 2006) (stating that 363 sale permits a buyer to take ownership of property without concern

that a creditor will file suit based on a successor liability theory); see also In re General Motors

Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and

District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of

successor liability claims, and in that connection, will issue the requested findings and associated

injunction"); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam*

claims, including any potential state successor or transferee liability claims against New

Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore

extinguished by the Sale Transaction").

   45. The purpose of an order purporting to authorize the transfer of assets free

and clear of all liens, claims, encumbrances and all other interests would be frustrated if

claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising

from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtor would run the

risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid

amounts.  To that end, the Successful Bidder should not be liable under any theory of successor

liability relating to the Debtor's businesses, but should hold the Acquired Assets free and clear.

E.    **A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

46.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); Abbotts Dairies of Penn., 788 F.2d at 147.

47.    The Stalking Horse Agreement was negotiated at arm's-length, with both parties represented by their own counsel. Accordingly, the Debtor requests that the Sale Order include a provision that the Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtor believes that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Acquired Assets.

F.    **Assumption and Assignment of Certain Assigned Contracts**

48.    As required by the Stalking Horse Agreement, and in order to enhance the value to the Debtor of the Acquired Assets (by curtailing further administrative liability to the estate and eliminating rejection damage claims), the Debtor requests authority, under section 365 of the Bankruptcy Code, to assume and assign the Assigned Contracts to the Stalking Horse Purchaser or, alternatively, to the Successful Bidder at the Auction. The Debtor further requests that the order approving the sale of the Acquired Assets provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Purchaser (or the Successful Bidder at Auction) notwithstanding any provisions in the Assigned

Contracts, including those described in sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

49.     The Debtor may, subject to Court approval, assume and assign executory contracts and unexpired leases under section 365 of the Bankruptcy Code.  11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  See, e.g., L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Further, such relief frequently has been granted by this Court.  See, e.g., In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. July 10, 2007).

50.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain, nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided.  11 U.S.C. § 365(b)(1)(A)-(C).

51.    Pursuant to the terms of the proposed Bidding Procedures Order, the Debtor will send the Cure Notice to all counterparties to the Assigned Contracts, notifying such counterparties of the potential assumption by the Debtor and assignment to the Stalking Horse Purchaser (or to the Successful Bidder at Auction) of the Assigned Contracts. The Cure Notice also will set forth the Cure Amount owing for each such Assigned Contract, according to the Debtor's books and records.

52.    Counterparties to the Assigned Contracts will be given time (as will be set forth in the Bidding Procedures Order) to file an objection to the proposed Cure Amount set forth in the Cure Notice. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount will be binding on the Debtor, the Stalking Horse Purchaser and the applicable Assigned Contract counterparty. The payment of the Cure Amounts specified in the Cure Notice (or a different amount either agreed to by the Debtor or resolved by the Court as a result of a timely-filed objection by an Assigned Contract counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtor determines, prior to the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Acquired Assets to the Stalking Horse Purchaser.

53.    Section 365(f)(2)(B) of the Bankruptcy Code states that a debtor may assign its unexpired leases and/or executory contracts if, *inter alia*, the assignee provides "adequate assurance of future performance." 11 U.S.C. § 365(f)(2)(B). If necessary, the Stalking Horse Purchaser, or the Successful Bidder at the Auction, will be required to submit, among other things, written evidence of its ability to provide adequate assurance of future

53653/0001-11859755v4

performance under the applicable contracts.  Contract parties also will be able to challenge the Successful Bidder's ability to provide adequate assurance as set forth in the Cure Notice.

54.     Any assumption and assignment of an Assigned Contract will be subject to all of the provisions of such Assigned Contract, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.  The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the Assigned Contracts, and the Debtor will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the Assigned Contracts.  Consequently, the Debtor believes that the proposed assumption and assignment of the Assigned Contracts is appropriate under the circumstances.

**G.     The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

55.     The Debtor will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order.

56.     The Debtor will have served this Motion (with all exhibits), and the Notice of Motion as set forth herein.  The notice of the proposed sale given by the Debtor sufficiently describes the terms and conditions of the proposed sale.

57.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

   a. <u>Section 363 Notice</u>.  Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors

30

have been provided notice of the salient details regarding this Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

b. <u>Bankruptcy Rule 2002</u>. Bankruptcy Rule 2002 requires twenty-one (21) days notice of the proposed sale of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. As set forth above, the notice of this Motion that has been and will be provided by the Debtor satisfies each of these requirements.

c. <u>Bankruptcy Rules 6004 and 6006</u>. Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtor has complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct. The Sale Notice and Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

d. <u>Procedural Due Process</u>. The notice of this Motion that is being provided, including notice being provided by publication as set forth above, is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion.

58. The Debtor submits that the notice it has provided and intends to provide both of the proposed sale and of this Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

## H. The Stay of the Sale Order Should be Waived

59. Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

31

60.    The Debtor requests that this Court order that such stay is not applicable with respect to the sale of the Acquired Assets and assignment of the Assigned Contracts. To require the Debtor to effectively be liable under the Assigned Contracts for an extra fourteen (14) days and to delay the closing will burden the estate and require unnecessary expenditures of the Debtor's limited resources. The Debtor notes that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) have previously been granted by this Court in other cases. See, e.g., In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re Copelands' Enters., Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006).

## NOTICE

61.    Notice of this Motion will be provided to: (a) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets and such other parties identified by the Consultation Parties prior to the date hereof; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets; (c) all federal, state and local taxing authorities which have a reasonably known interest in the relief requested by the Motion; (d) the Office of the United States Attorney for the District of Delaware; (e) the New York Attorney General's office; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) counsel to the Committee; (i) the Office of the United States Trustee; and (j) those parties who have filed the appropriate notice requesting notice of all pleadings filed in the Chapter 11 Case. The Debtor submits that, under the circumstances, no other or further notice is required.

**NO PRIOR REQUEST**

62.    No prior request for the relief sought in this Motion has been made to this or any other court.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested in the Motion and such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
       June 9, 2015

COLE SCHOTZ P.C.

/s/ David R. Hurst
David R. Hurst (I.D. No. 3743)
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

– and –

Daniel F.X. Geoghan
Jacob S. Frumkin
900 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel for Debtor and
Debtor-in-Possession*

53653/0001-11859755v4