## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
           :

In re:                       :     Chapter 11

           :

EGENIX, INC.,           :     Case No. 14-12818 (BLS)

           :

         Debtor.[1]    :     **Hrg. Date: 6/19/15 at 9:30 a.m. (ET)**

           :     **Obj. Deadline: 6/17/15 at 12:00 p.m. (ET)**

------------------------------------------------------- x

### DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING DEBTOR TO OBTAIN ALTERNATIVE POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362 AND 364(c) AND (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO DIP LENDER PURSUANT TO 11 U.S.C. § 364

Egenix, Inc., the debtor and debtor-in-possession in the above-captioned chapter

11 case (the "<u>Debtor</u>"), hereby moves (the "<u>Motion</u>"), pursuant to sections 105(a), 362 and 364 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), Rules 2002,

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "<u>Local Rules</u>"), for entry of an order (the "<u>DIP Order</u>"),

substantially in the form attached hereto:[2]

    (a)    authorizing the Debtor to obtain postpetition financing (the "<u>DIP Financing</u>") consisting of a first-lien superpriority term loan facility in the aggregate principal amount of 2,367,500 (the "<u>DIP Loan</u>") from Denan, Inc. or a designated affiliate (the "<u>DIP Lender</u>");

    (b)    authorizing the Debtor to execute and deliver, and incur all liabilities and obligations under:

---

[1]    The last four digits of the Debtor's federal tax identification number are 0172. The mailing address for the Debtor is 2363 Clove Road, LaGrangeville, NY 12540.

[2]    All capitalized terms used but not otherwise defined in the Motion shall have the meanings set forth in the Term Sheet (as defined herein).

(i)     that certain Supplemental Debtor-In-Possession Financing Term Sheet, dated as of June 9, 2015, as amended, modified, restated or supplemented in accordance with the terms thereof or hereof (the "Term Sheet"), a copy of which is attached to the DIP Order as Exhibit 3, and perform all such other and further acts as may be required in connection with the respective DIP Documents;[3] and

(ii)    all other agreements, documents, notes or instruments as may be required, necessary or desirable (including all collateral documents) and which are executed or delivered in connection with the Term Sheet, including the budget attached to the DIP Order as Exhibit 1 (the "Budget") and the Professional Fee Budget attached to the DIP Order as Exhibit 2 (the "Professional Fee Budget");

(c)     authorizing the Debtor to use proceeds of the DIP Loan solely as expressly permitted in the DIP Documents, including (i) to repay in full the Initial Funding Amounts (as defined below) and any interest due under the Prior DIP Financing (as defined below) and (ii) to fund the Debtor's operations in accordance with the Budget and any Permitted Variance (as defined below);

(d)     granting automatically perfected security interests in and liens on all of the DIP Collateral (as defined below) to the DIP Lender, and granting superpriority administrative expense status to the DIP Obligations (as defined in the Term Sheet), in each case on the terms and subject to the relative priorities set forth in the DIP Documents;

(e)     authorizing the Debtor to pay the principal, interest, fees, expenses, disbursements and other amounts payable under the DIP Documents as such amounts become due and payable; and

(f)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Order and the other DIP Documents.

In support of the Motion, the Debtor respectfully represents as follows:

---

[3]     "DIP Documents" shall mean, collectively, any collateral documents, guaranties, the Budget, the Professional Fee Budget and all such instruments and documents as may be executed and delivered in connection with or relating to the DIP Loan, the DIP Order and any certificate or other document made or delivered pursuant hereto or thereto.

## JURISDICTION AND VENUE

1.        The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.        The statutory and legal predicates for the relief sought herein are sections 105(a), 362 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

### A.      The Chapter 11 Case

3.        On December 28, 2014 (the "Petition Date"), the Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of the Chapter 11 Case, is set forth in the Declaration of William T. Nolan in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 9] (the "First Day Declaration").

4.        The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.        On January 22, 2015, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Case pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 46].  No trustee or examiner has been appointed in the Chapter 11 Case.

### B.      Initial DIP Financing

6.        By order entered on March 19, 2015 [Docket No. 137] (the "Prior DIP Order"), the Court approved debtor-in-possession financing (the "Prior DIP Financing") in the

3

principal amount of $1,200,000, funded from each of the following persons or entities (each, an

"Initial Lender" and, collectively, the "Initial Lenders") in the amounts set forth in the term sheet

attached to the Prior DIP Order (the "Prior Term Sheet") and below (each, an "Initial Funding

Amount" and, collectively, the "Initial Funding Amounts"):

| Initial Lender | Initial Funding Amounts |
| --- | --- |
| Lionel Goldfrank, III | $600,000 |
| John T. Reid, Ph.D. | $250,000 |
| David Clapp | $150,000 |
| Denan, Inc. | $100,000 |
| W. James Tozer, Jr. | $100,000 |
| Total | $1,200,000 |

**C.    Supplemental DIP Motion**

7.    On May 1, 2015, the Debtor filed a motion for approval of supplemental

DIP financing [Docket No. 190] (the "Supplemental DIP Motion").  The proposed $3.2 million

financing facility would be used to repay the funds borrowed under the Prior DIP Order, and to

fund the Debtor's operations through early September 2015.  The Supplemental DIP Motion

originally was scheduled for hearing on June 2, 2015 (the "June 2 Hearing"), but the hearing on

the motion was continued to permit consideration of the preliminary offer by the DIP Lender to

purchase substantially all of the Debtor's assets through a competitive auction process.  See

Docket No. 236.  The Supplemental DIP Motion remains pending before the Court, and

presently is scheduled to be heard at the June 19, 2015 (9:30 a.m.) hearing in this Chapter 11

Case (the "June 19 Hearing").

**D.    The Proposed Sale Process**

8.    Subsequent to the June 2 Hearing, the Debtor and the DIP Lender

negotiated an asset purchase agreement (the "Stalking Horse Agreement") for the sale of

4

substantially all of the Debtor's assets (the "Acquired Assets").[4]   Indeed, as a result of those

negotiations, substantially contemporaneously herewith the Debtor has filed a motion (the "Sale

Motion") seeking entry of (i) an order approving (a) bidding procedures to be employed in

connection with the proposed sale of the Acquired Assets (the "Bidding Procedures"),

(b) approving certain bidding protections, (c) scheduling an auction and a hearing to consider

approval of the sale of the Acquired Assets, and (d) approving a notice for the auction and

hearing and the assumption and assignment of certain executory contracts as set forth in the

Stalking Horse Agreement; and (ii) an order authorizing (a) the sale of the Acquired Assets to the

DIP Lender or to the bidder making the highest or otherwise best bid at the auction, and (b) the

Debtor's assumption and assignment of certain assigned contracts as described in the Stalking

Horse Agreement (collectively, the "Sale Process").

9.      The Sale Process and the DIP Financing proposed by this Motion are

linked.  If, as the Debtor expects, the Stalking Horse Agreement is fully negotiated and executed

prior to the June 19 Hearing, the Debtor will seek approval of both the Sale Motion and the DIP

Financing proposed hereby at that hearing.  Alternatively, if the Debtor is unable to finalize the

Stalking Horse Agreement with the DIP Lender prior to the June 19 Hearing, the Debtor

anticipates that it will seek approval of the DIP financing to be provided under the Supplemental

DIP Motion.

## SUMMARY OF DIP FINANCING TERMS

10.     In accordance with Bankruptcy Rules 4001(c) and (d), summarized below

are the significant terms of the DIP Documents and DIP Order.  Included in this summary is a

---

[4]      A draft of the Stalking Horse Agreement is attached to the Sale Motion (as defined herein).

description of each of the provisions required to be highlighted by Bankruptcy Rule 4001(c) and

Local Rule 4001-2.[5]

| | |
|---|---|
| Borrower: | Egenix, Inc. |
| DIP Lender: | Denan, Inc. or a designated affiliate. |
| Commitment and Availability: | The DIP Lender will make the DIP Loan to the Debtor under a debtor-in-possession term loan financing facility (the "DIP Facility") in the aggregate principal amount of $2,367,500 pursuant to the terms of the Term Sheet (such amount, the "Principal Amount"). Upon entry of the DIP Order, the Debtor shall borrow the full amount of the DIP Facility, subject to the terms and conditions set forth in the Term Sheet and in the DIP Order in accordance with the Budget. |
| Initial Funding Date: | Provided that the conditions precedent to funding contained in the Term Sheet are satisfied, the DIP Facility shall be funded no later than June 19, 2015 (the "Initial Funding Date"). The DIP Lender shall send by wire transfer the full amount of the DIP Facility to a bank account designated by the Debtor. |
| Interest Rate: | 6.0% per annum (the "Base Rate"). |
| Default Interest Rate: | Base Rate of 6.0%, plus 2.0% (the "Default Interest Rate"). |
| Maturity Date: | The DIP Facility shall be paid in full in cash on the date (the "Maturity Date") which is the earliest of (a) August 10, 2015, (b) the occurrence of a Termination Event (as defined below); and (c) such later date as the DIP Lender in its sole discretion may agree to in writing with the Debtor. |
| Prohibition on Asset Sales: | The Debtor shall not sell assets outside of the ordinary course of business other than through the Sale Process and Bidding Procedures approved in connection with the Stalking Horse Agreement. |

---

[5]    The descriptions of the terms of the proposed DIP Order provided in the Motion are intended only as a summary. In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Order, the terms of the DIP Order shall govern. Local Rule 4001-2 requires the Debtor to highlight certain provisions in the Motion. Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-2 are shown in bold and references to the Term Sheet and DIP Order are provided.

| | |
|---|---|
| Purpose: | The proceeds of the DIP Loan shall be used by the Debtor: (i) to repay in full the Initial Funding Amounts and any interest due under the Prior DIP Financing; and (ii) to fund the Debtor's operations, in accordance with the Budget and any Permitted Variance. |
| Compliance with Budget: | Compliance with the Budget will be measured every two (2) weeks on a trailing four (4) week basis.  For the avoidance of doubt, (i) the Debtor may amend the Budget with the written consent of the DIP Lender and in consultation with the Committee; provided that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Financing authorized by the DIP Order; and (ii) at any given time, the Debtor's actual cash disbursements may, on a cumulative basis, vary from the Budget by no more than 10.0% (the "Permitted Variance"). |
| Liens, Security and Priority: | **A grant of priority or a lien on property of the estate under section 364(c).  Bankruptcy Rule 4001(c)(1)(B)(i).  See Term Sheet, p. 7; DIP Order, ¶¶ 15-17, 21.** |
| | **The DIP Obligations pursuant to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code shall (i) constitute allowed superpriority administrative expense claims; (ii) be secured by first priority, perfected liens on and security interests in all the DIP Collateral (as defined below); and (iii) be subordinate only to the Carve-Out.** |
| | **The property of the Debtor that is subject to the aforesaid perfected liens and/or security interests in favor of the DIP Lender shall include, but not be limited to, all assets and property of the Debtor and its estate, whether now owned or existing or hereafter acquired, created or arising and wherever located (collectively, the "DIP Collateral"); provided, however, that "DIP Collateral" shall not include (i) actions arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code or any actions that may exist against the Debtor's current or former officers or directors (collectively, the "Causes of Action"), or (ii) the proceeds of such Causes of Action. Moreover, the DIP Lender's rights, if any, to share in the proceeds of any Causes of Action in connection with any unpaid DIP Obligations shall be subordinated to the prior payment in full of all allowed general unsecured claims.** |

53653/0001-11908215v4

| Borrowing Conditions: | Availability of the DIP Financing shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Lender: |

1.  The Court shall have entered a final order, in form and substance acceptable to the DIP Lender on or before June 19, 2015, which order, inter alia, shall approve the DIP Financing on a final basis, including, without limitation, the grant of, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable and fully perfected DIP Liens (as defined below) upon all DIP Collateral with the priority as set forth in the section entitled "Priority and Liens" in the Term Sheet and administrative expense claims referred to therein, to secure the DIP Obligations of the Debtor under the DIP Financing in accordance with the terms of the Term Sheet, effective as of the granting of the DIP Order, without the need for any further action on the part of the DIP Lender, the Debtor or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).

2.  The DIP Lender shall have been granted, and hold, a perfected first priority lien on, and security interest in, all the property of the Debtor and proceeds thereof.

3.  The Debtor and the DIP Lender shall have agreed to the Stalking Horse Agreement.

4.  The Court shall have entered an order, in form and substance acceptable to the DIP Lender on or before June 19, 2015 approving the Stalking Horse Agreement and Bidding Procedures.

5.  The DIP Lender shall have received and approved the Budget and the Debtor shall be in compliance with the Budget subject to Permitted Variances.

6.  All representations and warranties of the Debtor set forth in the Term Sheet and in the other DIP Documents shall be accurate in all material respects, on and as of such date as if made on and as of the Initial Funding Date, and after giving effect to the DIP Facility.

7.    The DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lender, and no application or motion shall have been made to the Court for any stay, modification or amendment of the DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

8.    No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

**Events of Default:**    The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, referred to as an "Event of Default") shall constitute a default under the Term Sheet:

1.    The failure by the Debtor to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the Term Sheet or in the DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within three (3) business days from notice of default.

2.    The cessation of the Term Sheet to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability of the DIP Facility being contested by the Debtor or the Debtor denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lender ceasing to have the benefit of the DIP Liens granted by the DIP Order.

3.    The failure of any of the following sale milestones to occur as of the date indicated:

    a.    the auction, as contemplated in the Bidding Procedures, to occur by July 20, 2015; or

    b.    the entry of an order approving the sale, as contemplated in the Bidding Procedures and in form and substance acceptable to the DIP Lender, to occur by July 24, 2015.

4.    Except as permitted in the DIP Order, the entry of any order of the Court granting to any third party a superpriority claim

9

or lien pari passu with or senior to that granted to the DIP Lender under the Term Sheet.

5.     The Debtor shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Financing or other than in accordance with the Budget approved by the DIP Lender.

6.     If, as of any Reporting Date (as defined in the Term Sheet), the Debtor's cumulative cash disbursements from the period from the Initial Funding Date through the end of any week exceeds 20% from the amount included in the Budget (i.e., exceeds scheduled disbursements by more than 20%).

7.     The entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor filing a motion or not opposing a motion seeking such relief.

8.     The entry of an order dismissing the Chapter 11 Case, or the Debtor filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Lender.

9.     The entry of any order in the Chapter 11 Case or any successor case, which order constitutes the stay, modification, appeal or reversal of the DIP Order or which otherwise affects the effectiveness of the DIP Order.

10.    The entry of an order in the Chapter 11 Case appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtor's business.

11.    The expansion of the Debtor's Board of Directors (the "Board") beyond its current size of six (6) members, or the removal of Dendy Young, Andrea Young, Lionel Goldfrank, III or John T. Reid, from the Board.

12.    The entry of an order in the Chapter 11 Case granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the DIP Collateral, of the Debtor or to commence or continue any prepetition litigation against the Debtor involving potential liability not covered by insurance, in excess of $200,000 in the aggregate.

53653/0001-11908215v4

13. Any judgment or order as to postpetition liability or debt for the payment of money in excess of $200,000 shall be rendered against the Debtor and the enforcement thereof shall not have been stayed.

14. Any non-monetary judgment or order with respect to a postpetition event shall be rendered against the Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtor; or (ii) have a material adverse effect on the rights and remedies of the DIP Lender under the Term Sheet, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

15. The DIP Order being amended or modified without the consent of the DIP Lender.

16. The commencement of any claim or cause of action by or on behalf of the Debtor or its estate against the DIP Lender.

17. The occurrence of a default or event of default under the Stalking Horse Agreement and such default of event of default is not waived or cured upon such occurrence.

Remedies:    If any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions:

1. If such Event of Default occurs prior to the making of the DIP Loan, declare the commitment of the DIP Lender to make the DIP Loan to be terminated, whereupon such commitment shall be terminated.

2. Declare the outstanding unpaid Principal Amount of the DIP Facility, all interest accrued and unpaid thereon, and all other amounts owing or payable thereunder, under the Term Sheet or under the DIP Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtor under the Term Sheet.

3. Declare interest on the DIP Obligations to accrue at the Default Interest Rate, whereupon the interest on the DIP Obligations shall automatically accrue at such default rate.

4.  Subject to the Default Notice Period (as defined in the Term Sheet), (i) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral; (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral; (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose; (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations (including any accrued interest) in any sale of the DIP Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 726 of the Bankruptcy Code, or otherwise; and (v) take whatever other action the DIP Lender may deem necessary or desirable for the protection of its interests.

5.  Exercise all rights and remedies available to the DIP Lender (whether as a secured creditor or otherwise) under the DIP Financing, the Term Sheet, the DIP Order or applicable law (including in respect of the DIP Collateral).

| | |
|---|---|
| Waiver / Modification: | **Waiver or modification of provisions of the Bankruptcy Code or applicable rules relating to the automatic stay or an entity's request to obtain credit under section 364 of the Bankruptcy Code. Bankruptcy Rules 4001(c)(1)(B)(iv) and 4001(c)(1)(B)(v). <u>See</u> Term Sheet, pp. 15-16; DIP Order, ¶¶ 8(j), 27.**<br><br>**At all times during the Chapter 11 Case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have to (i) challenge the application of any payments authorized by the DIP Order pursuant to section 506(b) of the Bankruptcy Code; (ii) seek authority to grant liens on the DIP Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise; or (iii) seek authority to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Lender, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtor uses the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations or the DIP Lender has provided its prior written consent to such action.** |

12

Subject to the DIP Order, upon the occurrence of a Termination Event (as defined in the DIP Order), the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided in the DIP Order and the other DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to the Court: (i) immediately cease making any DIP Loans to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately terminate the DIP Loan and the availability of any DIP Loans thereunder; (iv) immediately set off any and all amounts held on account of or owed to the Debtor against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lender for application towards the DIP Obligations; and (v) take any other actions or exercise any other rights or remedies permitted under the DIP Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; <u>provided</u> <u>that</u> notwithstanding anything in the Term Sheet to the contrary, the DIP Lender shall not enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period.

Carve Out:     Disparate treatment for the professionals retained by the Committee from those professionals retained by the Debtor with respect to a professional fee carve out.  Local Rule 4001-2(a)(i)(F).  <u>See</u> Term Sheet, pp. 7-8; DIP Order, ¶ 19.

As more fully set forth in the DIP Order, the DIP Liens and the DIP Superpriority Claims shall be subordinate to the "<u>Carve Out</u>."  The "<u>Carve Out</u>" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000; (iii) after the occurrence and during the continuance of an Event of Default, all allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee, that remain unpaid subsequent to the payment, <u>pro</u> <u>rata</u> with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtor's estate for such creditors, in an aggregate amount not exceeding $100,000 for the payment of the Debtor's professionals and $30,000 for payment of the Committee's

13

professionals, which amount may be used subject to the terms of the Term Sheet and the DIP Order (the "**Permitted Professional Fees**"); and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and the Committee at any time when no Event of Default is continuing, that remain unpaid or unfunded subsequent to an Event of Default, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent Professional Fee Budget delivered to and approved by the DIP Lender prior to any Event of Default that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements, in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing in the Term Sheet shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.

No portion of the Carve Out may be used to challenge the debt or collateral position of the DIP Lender, whether by challenging the validity of the indebtedness or the validity, perfection or priority of any security interest or lien or by seeking to invalidate, avoid, subordinate or otherwise impair any claim, security interest or lien or priorities created in connection with the DIP Facility, or by asserting any claim for damages allegedly arising out of the actions or inactions of the DIP Lender, or by seeking to recover on any transfers made to the DIP Lender.

| | |
|---|---|
| <u>Release from Lending Obligations:</u> | **Release and limitation on claims and causes of action. Bankruptcy Rule 4001(c)(1)(B)(viii). <u>See</u> Term Sheet, pp. 3, 16; DIP Order, ¶¶ 14, 24.** |

Upon the repayment of all DIP Obligations owed to the DIP Lender by the Debtor and termination of the rights and obligations arising under the DIP Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Term Sheet, the DIP Documents or the DIP Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out), on

14

**terms and conditions acceptable to the DIP Lender. Notwithstanding anything to the contrary in the Term Sheet, the Debtor's releases do not extend to the DIP Lender's obligations to make the DIP Loan and otherwise comply with the terms of the Term Sheet and the DIP Order.**

Indemnification:     **The indemnification of any entity.  Bankruptcy Rule 4001(c)(1)(B)(ix).  See Term Sheet, p. 16; DIP Order, ¶ 23.**

**The DIP Lender (and its affiliates, officers, directors, employees, advisors and agents) in such capacity will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the Term Sheet or the use or the proposed use of proceeds thereof, except to the extent found by a final, non-appealable judgment of a court to arise from the gross negligence, willful misconduct or fraud of the relevant indemnified person.**

Governing Law
and Jurisdiction:     Delaware

## RELIEF REQUESTED

11.     The Debtor seeks entry of the DIP Order granting the following relief:

   a.     authorizing the Debtor to execute and deliver the Term Sheet and obtain $2,367,500 of secured postpetition loans and other financial accommodations pursuant to the DIP Order;

   b.     granting an allowed DIP Superpriority Claim to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code;

   c.     granting to the DIP Lender security interests in, and liens on, all of the DIP Collateral pursuant to section 364(c)(2) of the Bankruptcy Code; and

   d.     modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Order.

## BASIS FOR RELIEF

12.     The Debtor has no revenues, and therefore must rely on the funds in its

bank account and borrowings to fund its operations (primarily research and development efforts)

and the administration of the Chapter 11 Case.  Without access to additional funding through the

15

DIP Loan, the Debtor is projected to run out of cash this month, before the Debtor would be able to maximize the estate's value through the Sale Process. If the requested financing is approved however, the Debtor believes that it will have sufficient funding to proceed with and consummate the Sale Process.

13.     The Debtor's Chief Restructuring Officer (the "CRO") negotiated the Term Sheet in good faith and at arms'-length with the DIP Lender. The Debtor believes that the terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration. Thus, the Debtor submits that the DIP Financing is in the best interests of the Debtor's estate, creditors and all other stakeholders and, therefore, that the relief requested herein should be granted.

**A.     The Debtor Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

14.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

15.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, the Debtor has the burden of proving that:

> (1)     It is unable to obtain unsecured credit pursuant to 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim pursuant to 11 U.S.C. § 503(b)(1)(A);

> (2)     The credit transaction is necessary to preserve the assets of the estate; and

16

(3)    The terms of the transaction are fair, reasonable and
adequate, given the circumstances of the debtor-
borrower and the proposed lender.

In re Los Angeles Dodgers, LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011).

16.    The Court "may not approve any credit transaction under subsection

(c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain

unsecured credit under section 364(a) or (b)." Id. at 313 (citing In re Ames Dep't Stores, Inc.,

115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)). To satisfy the requirements of section 364(c) of the

Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not

available" to the debtor on an unsecured or administrative expense basis. Bray v. Shenandoah

Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). The

statute does not, however, impose "a duty to seek credit from every possible lender" before

concluding that such credit is unavailable. In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr.

E.D. Pa. 1987) (citing Snowshoe, 789 at 1088). When few lenders are likely to be able and

willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to

require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc.,

100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky

Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115 B.R. at 40

(approving financing facility and holding that the debtor made reasonable efforts to satisfy the

standards of section 364(c) where it approached four lending institutions, was rejected by two,

and selected the most favorable of the two offers it received).

17.    For the reasons discussed below, the Debtor submits that it has satisfied

the standards required to access postpetition financing on a secured superpriority basis under

section 364(c) of the Bankruptcy Code.

53653/0001-11908215v4

(i)    **The Debtor Was Unable to Obtain Financing on More Favorable Terms**

18.    As detailed in the Declaration of William T. Nolan in Support of Motion

for Entry of an Order (I) Authorizing Debtor to Obtain Supplemental Postpetition Secured

Financing Pursuant to 11 U.S.C. §§ 105, 362 and 364(c) and (II) Granting Liens and

Superpriority Claims to DIP Lenders Pursuant to 11 U.S.C. § 364 [Docket No. 198], the Debtor

has been unable to procure sufficient financing in the form of unsecured credit allowable under

sections 364(a) or (b) of the Bankruptcy Code.  The DIP Lender is the only party that offered to

provide the Debtor with postpetition financing in connection with the proposed Sale Process.[6]

Moreover, the DIP Lender is willing to lend to the Debtor only on the terms and conditions set

forth in the Stalking Horse Agreement, the DIP Documents and the DIP Order.

19.    Without the agreement of the DIP Lender to provide the Debtor with

postpetition financing, or approval of the Supplemental DIP Motion in the event this Motion is

not approved, the Debtor likely would be forced to shut down and liquidate its business.  Instead,

with the DIP Financing, the Debtor intends to continue its operations during the Chapter 11 Case

and proceed with the Sale Process.

20.    The Debtor respectfully submits that its efforts to obtain postpetition

financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.

See, e.g., Ames Dep't Stores, 115 B.R. at 38 (stating that with respect to postpetition credit,

courts "permit debtors-in-possession to exercise their basic business judgment consistent with

their fiduciary duties"); In re Sky Valley, Inc., 100 B.R. at 113 (noting that where few lenders

can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to

require [the debtor] to conduct such an exhaustive search for financing").

---

[6]    As noted above, other lenders have agreed to provide financing to the Debtor pursuant to the Supplemental DIP Motion.  Such financing would be on financial terms substantially similar to those being proposed by the DIP Lender under this Motion.

**(ii)**     **The DIP Financing is Necessary to Preserve the Assets of the Debtor's Estate**

21.     As debtor-in-possession, the Debtor has a fiduciary duty to protect and maximize its estate's assets. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtor requires access to working capital in the form of additional postpetition financing to continue to operate its business during the Chapter 11 Case and proceed with the Sale Process. Absent additional working capital, the Debtor would be forced to liquidate. Accordingly, the DIP Financing is necessary to preserve the Debtor's assets.

**(iii)**     **The Terms of the DIP Financing Are Fair, Reasonable and Appropriate Given the Circumstances**

22.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (stating that a debtor may have to enter into hard bargains to acquire funds).

23.     The Debtor's CRO negotiated the DIP Financing in good faith and at arms'-length with the DIP Lender, resulting in an agreement designed to permit the Debtor to maximize the value of its assets during the Chapter 11 Case. See, e.g., Snowshoe Co., 789 F.2d at 1088 (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); In re W. Pac. Airlines, Inc., 223 B.R. 567, 573 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of its value and the "immediate collapse of the Debtor as a going

19

concern"). Accordingly, and as set forth in more detail herein, the terms and conditions of the

DIP Financing are fair, reasonable and appropriate under the circumstances.

    **(iv)**     **Entry Into the DIP Financing Reflects the Debtor's Sound Business Judgment**

    24.     A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g.,

Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); Ames Dep't Stores, 115 B.R. at 38

(financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business

judgment).

    25.     Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money. See, e.g., U.S. Bank Trust Nat'l

Ass'n v. Am. Airlines, Inc. (In re AMR Corp.), 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In

determining whether to approve a debtor's request under Section 364, a Court must examine

whether the relief requested is an appropriate exercise of the debtor's business judgment."); In re

DB Capital Holdings, LLC, 454 B.R. 804, 822-23 (Bankr. D. Colo. 2011) (stating that a debtor

must demonstrate, among other things, that the proposed financing is an exercise of sound and

reasonable business judgment). Further, one court has noted that "[m]ore exacting scrutiny [of

the debtor's business decisions] would slow the administration of the debtor's estate and increase

its cost, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

53653/0001-11908215v4

26.     Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 514 n. 11(a) (Bankr. D. Utah 1981).  Generally, a court will not second-guess a debtor-in-possession's business decisions as long as, as a whole, the decisions are within the debtor's sound business judgment.  See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990); cf. In re Ames Dep't Stores, Inc., E. Retailers Serv. Corp., et al., 115 B.R. 34, 37–38 (Bankr. S.D.N.Y. 1990) (noting that courts, in passing upon arrangements for postpetition financing under section 364(b)-(d), consider, inter alia, whether the terms would tilt the conduct of the bankruptcy case in a manner inconsistent with chapter 11, or merely reflect a debtor's business judgment).

27.     As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Financing and submits that it has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Term Sheet.  The Debtor believes that the DIP Financing contains terms that are the best available under the circumstances.  Moreover, the DIP Financing will facilitate the consummation of the Sale Process, which the Debtor believes is its most likely path to emergence from chapter 11.  In that regard, the funds provided by the DIP Financing are essential to enable the Debtor to operate during the Chapter 11 Case and to consummate the Sale Process.

**B.      Modification of the Automatic Stay is Warranted**

28.     The proposed DIP Order describes certain circumstances under which the automatic stay could be vacated without further order of the Court.  Specifically, the proposed DIP Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the DIP Order, but subject to five (5) business days prior written notice, the automatic

21

stay is modified or vacated to allow the DIP Lender to terminate the commitments under the

Term Sheet, declare all DIP Obligations immediately due and payable and/or take any actions

necessary to foreclose or otherwise enforce the DIP Lender's security interests in or liens on any

or all of the DIP Collateral.

29.     The Debtor submits that such stay modification is an essential element of

the Term Sheet and the terms of the DIP Facility negotiated with the DIP Lender, and that the

DIP Order provisions modifying the automatic stay provide sufficient protection to the Debtor

and other parties in interest.  Accordingly, the Debtor submits that the Court should modify the

automatic stay to the extent contemplated by the DIP Financing and the proposed DIP Order.

## WAIVER OF BANKRUPTCY RULE 6004(h)

30.     To implement the foregoing successfully, the Debtor seeks a waiver of the

fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy

Rule 6004(h).

## NO PRIOR REQUEST

31.     No prior motion for the relief requested herein has been made to this or

any other court.

## NOTICE

32.     Notice of the Motion will be provided to: (a) the U.S. Trustee; (b) counsel

to the Initial Lenders; (c) counsel to the DIP Lender; (d) counsel to the Committee; and (e) all

parties entitled to notice pursuant to Local Rule 2002-1.  The Debtor submits that, under the

circumstances, no other or further notice is required.

53653/0001-11908215v4

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the DIP Order, substantially in the form attached hereto, (a) authorizing the Debtor to obtain secured postpetition financing; and (b) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
June 9, 2015

COLE SCHOTZ P.C.

/s/ David R. Hurst
David R. Hurst (I.D. No. 3743)
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

– and –

Daniel F.X. Geoghan
Jacob S. Frumkin
900 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel for Debtor and
Debtor-in-Possession*