IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
: 
In re: : Chapter 11
:
EGENIX, INC., : Case No. 14-12818 (BLS)
:
Debtor.[1] : **Related to Docket Nos. 246, 271**
:
---------------------------------------------------------- x

**DECLARATION OF WILLIAM T. NOLAN IN SUPPORT OF
DEBTOR'S MOTION FOR ORDER AUTHORIZING (A) THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR
OF LIENS, CLAIMS AND ENCUMBRANCES; AND (B) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

I, William T. Nolan, declare and state as follows:

1. I am the Chief Restructuring Officer of Egenix, Inc. (the "Debtor"), a corporation organized under the laws of the state of Delaware and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case").

2. I submit this declaration (the "Declaration") in support of the Debtor's proposed sale of substantially all of its assets to Bantam Pharmaceutical, LLC, pursuant to the Debtor's Motion for (I) Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtor's Assets Pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) Approving Bid Protections; (C) Scheduling an Auction and Hearing to Consider Approval of the Sale; and (D) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of the Sale and the Assumption and Assignment of Certain Executory Contracts; and (II) Order Authorizing (A) the Sale of Substantially All of the Debtor's

---

[1] The last four digits of the Debtor's federal tax identification number are 0172. The mailing address for the Debtor is 2363 Clove Road, LaGrangeville, NY 12540.

Assets Free and Clear of Liens, Claims and Encumbrances; and (B) Assumption and Assignment of Certain Executory Contracts [Docket No. 246] (the "Sale Motion"),[2] which was filed with the Court on June 9, 2015. I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtor.

3.     I have served as a financial and restructuring advisor to the Debtor since May 2014 and, upon the commencement of the Chapter 11 Case, was appointed the Debtor's Chief Restructuring Officer. I am a seasoned financial advisor and investment banker with over thirty-five (35) years of experience in corporate finance, capital markets and restructurings. In 1989, I founded Devonshire Holdings, Inc. ("Devonshire") to assist small and medium-sized companies with financial advisory services, including restructurings, turnarounds, buyouts and private placements, and I continue to serve as president of Devonshire. As a result of my time with the Debtor, my review of relevant documents and my discussions with other members of the Debtor's management team and the Debtor's board of directors (the "Board"), I am generally familiar with the Debtor's day-to-day operations, business affairs and books and records.

4.     Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's management and the Board, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtor's operations and financial condition. In making this Declaration, I also have relied on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures, as applicable.

5. In Part I of this Declaration, I describe the Debtor's pre- and post-petition fundraising efforts, along with the Debtor's efforts to locate potential buyers for its assets. In Part II of this Declaration, I describe the sale and auction process undertaken by the Debtor, and explain my opinion that consummating the proposed sale is a sound exercise of the Debtor's business judgement, will maximize the value of the Debtor's estate and is in the best interests of the Debtor's estate, creditors and all other parties in interest.

## I. THE DEBTOR'S FUNDRAISING AND MARKETING PROCESS

### A. Prepetition Fundraising Efforts

6. As described in detail in my declaration in support of the Debtor's chapter 11 petition and first day pleadings [Docket No. 9] (the "First Day Declaration"), prior to the Petition Date the Debtor retained Devonshire to, among other things, identify sources of funding and to raise capital. To this end, from the date of Devonshire's retention to the Petition Date, my colleagues and I contacted, both formally and informally, nearly eighty (80) private equity funds, high net worth individuals and family offices, and other potential financing sources, including professional biotechnology investors. The most common response from these potential investors was that the Debtor's development efforts were at too early a stage and that the Debtor did not yet have enough proprietary data for investors' evaluation. Some potential investors also expressed concern that the Debtor did not at the time have significant patentable intellectual property, and that in any case there was no valuation for the Debtor's intellectual property.[3] Although Devonshire's initial fundraising efforts were unsuccessful, they did provide me with a valuable understanding of the investor landscape with respect to a technology such as the Debtor's.

---

[3] My First Day Declaration provides addition detail regarding other obstacles to debt and equity fundraising that the Debtor faced outside of bankruptcy (*e.g.*, existing agreements that would immediately and drastically dilute the investment of any new equity investor). See First Day Declaration at ¶¶ 20-22.

B. **Initial Postpetition Fundraising Efforts**

7. On March 19, 2015, the Court approved the Debtor's initial debtor-in-possession ("DIP") financing facility in the principal amount of $1,200,000 (the "Initial DIP Financing").[4] In connection with raising this initial funding, I contacted over thirty (30) parties for the purpose of procuring proposals for DIP financing for the Debtor. In addition to contacting several entities that are in the business of providing DIP financing, I also contacted various individuals (both insiders and non-insiders), broker dealers and private equity funds.

8. Although from my experience I strongly suspected that traditional asset-based DIP lenders would have no interest in financing the Debtor, as the Debtor has no hard assets and very little patented intellectual property, I nonetheless discussed the potential financing opportunity with two (2) such lenders. As expected, these asset-based lenders had absolutely no interest in providing financing. Even if I could have made the lenders comfortable with the Debtor's asset package—which is unlikely given there was almost *no* asset package—the terms of the financing would have been onerous. Indeed, another lender that I approached after negotiating the Initial DIP Financing commented that no one would ever provide DIP financing on such terms.

9. The broker dealers also were not interested in providing funding to the Debtor. Among other things, these entities declined to participate due to the small size of the proposed investment, the significant due diligence that would have been required and the short timeline involved. I did get some interest from this group for providing future financing, especially if the dollar amount of the investment would justify the significant diligence investment required.

---

[4] *See* Order (I) Authorizing Debtor to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362 and 364 and (II) Granting Liens and Superpriority Claims to DIP Lenders Pursuant to 11 U.S.C. § 364 [Docket No. 137].

4

10. The biotechnology investors and private equity funds we approached also declined to provide funding. These groups had similar concerns to the broker dealers—*i.e.*, significant diligence required and limited time to accomplish it—but they also expressed concern over the limited data available for evaluation of the Debtor's molecules. While there was definite interest from several of these investors, they would not provide funding before the Debtor is able to provide data confirming the efficacy, potency and low toxicity of the Debtor's candidate molecules.

11. While I spoke with high net worth individuals that are not insiders of the Debtor, these individuals declined to participate in the DIP financing for a variety of reasons. In particular, these individuals expressed concern regarding the high risk of the investment, the limited diligence available and the effort that it would take to adequately understand the Debtor's technology, the lack of hard collateral, the early stage of the Debtor's intellectual property and the uncertainty of investing in a chapter 11 debtor, among other things.

12. Fortunately, I had more luck obtaining initial financing from certain of the Debtor's "insiders,"[5] and a group of such investors ultimately agreed to provide DIP financing to the Debtor. The DIP lenders for this first round of financing (the "Initial Lenders") were Lionel Goldfrank, III; John T. Reid, PhD; David Clapp; Denan, Inc. ("Denan"); and W. James Tozer, Jr. Mr. Goldfrank is the Chairman of the Debtor's Board and the Debtor's largest shareholder. Mr. Reid is a member of the Board and a shareholder of the Debtor. Mr. Clapp and Mr. Tozer both are shareholders of and corporate advisors to the Debtor. Denan is an entity controlled by Dendy Young and Andrea Young, both of whom are members of the Debtor's Board. Denan is a significant unsecured lender of the Debtor (currently owed $2,140,000) and a shareholder of the

---

[5] I use the term "insiders" to indicate that these DIP lenders all have a connection to the Debtor that gives them particular familiarity with the Debtor and its technology. Some also are "insiders" as that term is defined under the Bankruptcy Code or other applicable law.

Debtor. The Initial Lenders were the only parties that offered to provide the Debtor with initial postpetition financing.

### C. Subsequent Postpetition Fundraising Efforts

13. Although the Debtor was successful in raising an initial $1,200,000 in financing in March, the Debtor had been attempting to raise more significant funding at that time. Unfortunately, due to a variety of factors, including the limited test results available at the time and the short time within which to raise capital, the Debtor was unable in March to raise sufficient financing to carry it through to the conclusion of the Chapter 11 Case.

14. Fortunately, the Debtor's technology has advanced steadily throughout the Chapter 11 Case and, at a March 31, 2015 meeting in Montreal, Canada, the Debtor's contract research organizations reported significant scientific progress. This meeting was attended by a group of the Debtor's directors, management and shareholders, and meeting participants left Montreal with great optimism for the future of the Debtor's cancer therapeutics technology.

15. This optimism led to a willingness on the part of certain of the Debtor's "insiders"[6] to offer to provide supplemental DIP financing to the Debtor. The DIP lenders for this supplemental round of financing (the "Proposed Supplemental DIP Lenders") were Lionel Goldfrank, III; W. James Tozer, Jr.; Victor F. Keen; John T. Reid, PhD; and David Clapp. Thus, the Proposed Supplemental DIP Lender group was largely the same as the Initial Lender group, although Denan elected not to participate in this second round of financing, and Mr. Keen joined the lending group.[7]

---

[6] As noted above, I use the term "insiders" to indicate that the DIP lenders all have a connection to the Debtor that gives them particular familiarity with the Debtor and its technology. Some also are "insiders" as that term is defined under the Bankruptcy Code or other applicable law.

[7] Mr. Keen is a shareholder of the Debtor, and an observer of the Debtor's Board.

16. On May 1, 2015, the Debtor filed the Debtor's Motion for Entry of Order (I) Authorizing Debtor to Obtain Supplemental Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362 and 364(c) and (II) Granting Liens and Superpriority Claims to DIP Lenders Pursuant to 11 U.S.C. § 364 [Docket No. 190] (the "Supplemental DIP Motion"), thereby seeking approval of this second round of DIP financing. The hearing on the Supplemental DIP Motion was set for June 2, 2015.

17. Although based on my experience in seeking initial DIP financing for the Debtor, I believed I would have a difficult time raising additional DIP financing from parties other than the "insiders" that had provided the initial financing, I nonetheless sought to obtain financing from third-party investors. In particular, after the Debtor's initial DIP financing was approved on March 19, 2015, I contacted at least ten (10) additional parties for the purpose of procuring proposals for the second round of DIP financing. In addition to contacting several entities that are in the business of providing DIP financing, I also contacted various individuals (both insiders and non-insiders), broker dealers and private equity funds.

18. Despite the positive developments in the Debtor's research and development efforts reported at the March 31, 2015 meeting in Montreal and thereafter, I again encountered the fact that traditional asset-based DIP lenders would have no interest in financing the Debtor, as the Debtor has no hard assets and very little patented intellectual property. More specifically, I discussed the potential financing opportunity with two (2) additional such lenders, and received no indications of interest whatsoever. Moreover, I again received the comment that no traditional DIP lender would consider providing financing on the terms being proposed (*i.e.*, those terms agreed to by the "insider" lenders).

19. I also re-contacted several broker dealers who initially had not been interested in providing funding to the Debtor, except perhaps in the context of exit financing. They repeated the same concerns voiced in prior conversations, including the small size of the proposed investment, the significant due diligence that would be required and the short timeline involved.

20. In my continuing efforts to procure additional financing, I contacted several additional biotechnology investors and private equity funds, but they also declined to provide funding. These groups again raised concerns regarding the significant diligence required and limited time to accomplish it. Although there was some interest from several of these investors stemming the Debtor's recent research and development progress, they still were not willing to undertake the time consuming process that would be necessary to diligence the investment opportunity. My contacts with these investors were nonetheless positive, and they provided the names of an additional broker/dealer and several other investors that might be interested in such an investment opportunity.

21. Finally, I contacted additional high net worth individuals that are not insiders of the Debtor, to gauge their interest in a possible investment. These individuals raised similar concerns to those voiced during my first round of fundraising (*e.g.*, risk of investment, lack of hard collateral, early stage of intellectual property), and declined the investment opportunity.

**D.    The Denan Sale and Financing Proposal**

22. In late April 2015, Denan approached the Debtor with an outline of a sale proposal, which included a proposal by Denan to provide sufficient DIP financing to conduct the proposed sale of substantially all of the Debtor's assets to Denan pursuant to a competitive

auction process. After consultation with the Official Committee of Unsecured Creditors (the "Committee"), the Debtor determined that Denan's April proposal would not provide sufficient (if any) recovery to creditors and therefore was not in the best interests of the Debtor's estate or stakeholders. Although the Debtor rejected Denan's initial sale offer, both the Debtor and the Committee encouraged Denan to improve the terms of its proposal.

23. On Friday, May 15, 2015, Denan delivered a revised sale term sheet to the Debtor and the Committee. This time, the Debtor and the Committee determined that the proposal—once finally negotiated and memorialized in a binding asset purchase agreement—would provide an appropriate stalking horse proposal in a competitive sale process. The following Tuesday—May 19, 2015—the Debtor advised Denan that the Debtor was willing to move forward with a sale process, subject to final negotiation of the documents.

24. Although the parties had hoped to file motions for approval of the Denan sale process and DIP financing prior to the June 2, 2015 hearing, the documents were not completed in time for that hearing. However, because the parties were sufficiently close to finalizing the terms of the proposed sale and financing, the Debtor sought to adjourn the hearing on the Supplemental DIP Motion, which was scheduled to be heard by the Court on that date.

25. Both the Sale Motion and the motion for approval of DIP financing to be provided by Denan[8] were filed on June 9, 2015, and scheduled for hearing on June 19, 2015. At the June 19, 2015 hearing, the Court approved the Alternative DIP Motion, along with bidding procedures, bid protections, sale-related dates and deadlines and other sale-related relief. *See* Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtor's Assets Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bid

---

[8] Debtor's Motion for Entry of Order (I) Authorizing Debtor to Obtain Alternative Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362 and 364(c) and (II) Granting Liens and Superpriority Claims to DIP Lender Pursuant to 11 U.S.C. § 364 [Docket No. 247] (the "Alternative DIP Motion").

9

Protections; (C) Scheduling an Auction and Hearing to Consider Approval of the Sale; and (D) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of the Sale and the Assumption and Assignment of Certain Executory Contracts [Docket No. 271] (the "Bidding Procedures Order"). The Bidding Procedures Order also provided that Denan was deemed a Qualified Bidder (as defined below), and the Stalking Horse Agreement (as defined below) submitted by Denan was deemed a Qualified Bid.

26. A draft asset purchase agreement, by and between the Debtor and Denan (or its designee), was attached to the Sale Motion as Exhibit B. Then, prior to the June 19, 2015 hearing, the Debtor filed the final form of the asset purchase agreement, by and between the Debtor and Denan (or its designee), dated as of June 18, 2015 [Docket No. 264-1] (the "Stalking Horse Agreement"). The purchase price under the Stalking Horse Agreement was $3,885,000, including an estimated credit bid of $2,367,500 and a cash component of $817,500.

E. **Sale Marketing Efforts**

27. Although I had not expressly been seeking to market the Debtor's assets when speaking to parties regarding providing DIP financing (*i.e.*, I was seeking to identify a party to provide financing, rather than to purchase the Debtor's assets), many of the parties contacted in connection with my efforts to raise financing also would be potential buyers for the Debtor's assets. Unfortunately, for the same reasons that these parties elected not to provide financing, I believed they would be unlikely to participate in the proposed sale process.

28. Moreover, when it became likely that the Debtor would pursue a competitive sale process, the Debtor sought to retain an investment banker to assist it in the process—but could not convince any banker contacted to accept the assignment. In particular, the Debtor contacted more than a half dozen investment banking firms to assist with the sale of

the Debtor's assets, and each declined to participate. Among other things, bankers were concerned by the small size of the potential transaction, the very early stage of the Debtor's technology, the limited test data available, the fact that the Debtor has no established management structure and the added complexity of conducting a sale process on an expedited timeline within the Chapter 11 Case. In short, the bankers did not believe the sale process would be successful, at least at a level that would make it worth their investment of time and manpower.

29. Although based on my extensive contacts with potential investors over the past year I anticipated it would be difficult to locate an interested buyer, the Debtor nonetheless sought to contact the most likely buyers during the marketing period prior to the Bid Deadline. In particular, after the Bidding Procedures Order was entered by the Court on June 19, 2015, the Debtor sent sale information—including the sale notice and bidding procedures approved by the Court, along with an introductory letter—to all parties that had expressed any interest in providing financing or otherwise engaging in some sort of a transaction with the Debtor. More specifically, the Debtor sent sale information to over fifty (50) potential financial and strategic buyers, by both regular mail and electronic mail (when possible). The Debtor also made contact with the most likely potential buyers by telephone.

30. The Committee's financial advisor, Carl Marks Advisory Group LLC ("Carl Marks"), reviewed the Debtor's buyer contact list, and identified nine (9) additional potential financial and strategic buyers. Carl Marks forwarded to the Debtor contact information for these potential buyers, and made an introductory contact with each of the strategic buyers. The Debtor then sent sale information to all of the potential buyers identified by Carl Marks.

31. Despite the significant number of parties contacted, the Debtor received very little interest from potential buyers. Indeed, the large majority of parties contacted simply did not respond. Although a few parties expressed an interest in the Debtor's technology, they were not interested in participating in the auction process.

## II. THE AUCTION AND SALE PROCESS

### A. The Auction

32. The Bidding Procedures Order set July 17, 2015 at 5:00 p.m. (Eastern Time) as the bid deadline (the "Bid Deadline") for interested buyers to submit Qualified Bids. The Debtor received one (1) Qualified Bid in advance of the Bid Deadline (*i.e.*, in addition to Denan's stalking horse proposal), which bid was received from Bantam Pharmaceutical, LLC ("Bantam" and, together with Denan, the "Qualified Bidders"). Bantam's members are Mr. Goldfrank, Mr. Keen, Mr. Reid, Mr. Tozer and Mr. Clapp, of which Messrs. Goldfrank, Keen and Tozer are members of Bantam's board of managers.

33. On July 20, 2015, pursuant to the Bidding Procedures Order, the Debtor conducted an auction for the sale of substantially all of the Debtor's assets (the "Auction") commencing at approximately 10:20 a.m. (Eastern Time) in Wilmington, Delaware. The Auction was transcribed by a stenographer. I was present at the Auction, along with counsel to the Debtor, various professionals representing the Committee, and the Qualified Bidders and their professionals. In accordance with the Bidding Procedures, the Auction commenced with the Debtor's counsel providing information (and certain documentation) relating to the bidding process, the terms of the Qualified Bid that was designated the initial highest and best bid, and other Auction mechanics. Thereafter, bidding commenced, and each of the Qualified Bidders participated in the Auction.

34.  After three (3) rounds of competitive bidding between the Qualified Bidders, the Debtor, in consultation with its counsel and the Consultation Parties (as defined in the Bidding Procedures),[9] determined that the highest or otherwise best bid for the Acquired Assets was the bid submitted at the Auction by Bantam (the "Successful Bidder"). The Bantam bid provided for a purchase price of $5,112,377.  In addition, the Debtor, pursuant to the terms of the Bidding Procedures and in consultation with its counsel and the Consultation Parties, designated the bid submitted by Denan (the "Backup Bidder") as the backup bid (the "Backup Bid") for the Acquired Assets, which provided for a purchase price of approximately $5,012,377, which includes a cash component of $1,561,201.

35.  Based on the foregoing, I believe that the proposed sale of substantially all of the Debtor's assets (the "Proposed Sale") to the Successful Bidder pursuant to the asset purchase agreement, dated as of July 20, 2015, by and between the Debtor and Bantam (the "Acquisition Agreement"), is the highest and best offer attainable at this time for the Acquired Assets.

**B.    The Proposed Sale is a Proper Exercise of the Debtor's Business Judgment**

36.  With the help of its advisors and the Committee's professionals, the Debtor has engaged in a sale and marketing process culminating in the Proposed Sale to the Successful Bidder, pursuant to the Acquisition Agreement. Notably, the purchase price under the Acquisition Agreement is approximately $1.077 million above the purchase price under the Stalking Horse Agreement (an increase of almost 27%), reflecting the significant value that the Debtor's estate has derived from the sale and auction process. Accordingly, the Debtor and its advisors have concluded—after a sale process and arm's-length negotiations with the Successful

---

[9] The Bidding Procedures provide that, "[t]he Debtor shall consult with the Committee and its counsel and advisors (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in the Bidding Procedures." *See* Bidding Procedures, p. 10.

13

Bidder and its advisors—that the Proposed Sale is critical to the Debtor's efforts to maximize the value of its estate for the benefit of all stakeholders.

37. Moreover, throughout the sale process the Debtor and its advisors frequently consulted with the Committee's professionals to provide updates regarding, and to review, the sale process.

### C. The Proposed Sale is the Best Strategic Alternative for the Debtor to Maximize Value

38. The Debtor has been under chapter 11 protection for more than six (6) months, and during that time has continuously sought funding from a wide variety of sources, including funding to consummate a plan of reorganization. While the Debtor has successfully obtained two rounds of DIP financing to finance the Chapter 11 Case and to continue its efforts to develop a viable case exit strategy, the only concrete sale or plan offer received during the case was from Denan, through its offer to purchase the Acquired Assets pursuant to the terms of the Stalking Horse Agreement.

39. Accordingly, and in the exercise of its business judgment, the Debtor concluded that the best way to maximize value for the benefit of its estate and creditors was to sell the Acquired Assets through a competitive bidding process. To that end, the Debtor negotiated the Stalking Horse Agreement with Denan to provide for the sale of the Acquired Assets and for the Debtor's assumption and assignment to Denan of the Assigned Contracts. The transactions contemplated by the Stalking Horse Agreement were designed to maximize the value of the Debtor's assets for the benefit of its stakeholders through a prompt sale of the Acquired Assets.

40. Through the Auction process, the Debtor was able to raise the consideration offered for the Acquired Assets by approximately $1.077 million, resulting in a

purchase price of approximately $5.112 million. Based on my deep involvement in all aspects of the sale and Auction process, I believe that both the Debtor and the Successful Bidder have acted in good faith in conducting the sale process and the Auction. Moreover, I do not believe that the price of the sale was controlled by an agreement between bidders, and indeed believe that the price for the Acquired Assets achieved in the Auction process represents the highest value attainable under the circumstances.

## CONCLUSION

Accordingly, for the reasons set forth herein, I believe that the Proposed Sale will allow the Debtor to attain its goal of maximizing the value of its estate and, therefore, is in the best interests of the Debtor, its estate, its creditors and all other parties in interest. Moreover, the transfer of the Debtor's intellectual property to the Successful Bidder will ensure the continued development of the Debtor's promising cancer therapeutics technology.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 21, 2015

*/s/ William T. Nolan*
William T. Nolan
Chief Restructuring Officer